## FAITOUTE IRON & STEEL CO. ET AL. *v.* CITY OF ASBURY PARK.

No. 896. Argued April 28, 1942.—Decided June 1, 1942.

*Mr. Arthur T. Vanderbilt* for appellants.

*Mr. Ward Kremer* for appellee.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

A New Jersey statute, adopted in 1931, authorized state control over insolvent municipalities. By a supplementary law, enacted in 1933, a plan for adjustment of the claims of creditors of such an insolvent municipality could be made binding upon all creditors. The question is whether an adjustment so authorized by a state impairs rights in violation of the Constitution of the United States.

The City of Asbury Park is a seashore resort with a resident population of 15,000. It presents a familiar picture of optimistic and extravagant municipal expansion caught in the destructive grip of general economic depression: elaborate beachfront improvements, costs in excess of estimates, deficits not annually met by taxation, declining real-estate values, inability to refinance a disproportionately heavy load of short-term obligations, and, inevitably, default. Accordingly, in January, 1935, availing themselves of the New Jersey Municipal Finance Act, creditors applied to the Supreme Court of New Jersey to place the state Municipal Finance Commission in control of the city's finances.

The legislation was enacted "to meet the public emergency arising from a default in the payment of municipal obligations, and the resulting impairment of public credit," Laws of New Jersey (1931), c. 340, § 405. In broad terms, the legislation, through combined administrative and judicial action, adapted the underlying principles of an equity receivership to the solution of the problem of insolvent municipalities. By a supplementing Act, Laws of New Jersey (1933), c. 331, a "plan of adjustment or composition of the claims of all creditors" may be submitted on their behalf to the supreme court of the state. If approved by 85 per cent in amount of the creditors and by the municipality and the Commission, such plan of adjustment may be adopted "if the court by its justice determines (1) that the municipality is unable to pay in full according to their terms the claims proposed to be adjusted or composed, and perform its public functions and preserve the value of property subject to taxation, (2) that the adjustment or composition is substantially measured by the capacity of a municipality to pay, (3) that it is in the interest of all the creditors affected thereby, and (4) that it is not detrimental to other creditors of the municipality." The plan cannot be authorized, however, if it involves any reduction of the principal amount of any outstanding obligation. Any creditor is entitled to appear and to be heard, but a plan which is so authorized by the court is binding upon all creditors whether or not they appear, and the substitution of new obligations for old in carrying out the plan is made effective from the day fixed by judicial order. To effectuate such a plan, the Act provides further that the court shall retain jurisdiction and "thereafter no creditor whose claim is included in such adjustment or composition shall be authorized to bring any action or proceeding of any kind or character for the enforcement of his claim except with the permission of the supreme

court and then only to recover and enforce the rights given him by the adjustment or composition." [1]

Pursuant to this legislative scheme, the City of Asbury Park was on March 7, 1935, placed under the control of the Municipal Finance Commission; on February 1, 1936, a plan for the refunding of its bonded debt was filed in the State Supreme Court, and that court took jurisdiction of

---

[1] The text of the legislation as incorporated in N. J. Revised Statutes (1937), tit. 52, c. 27, indicates the careful character of the legislation:

"52: 27–34. Petition by creditors; plan of adjustment or composition; parties; notice. Upon the verified petition of any creditors of a municipality in which the commission shall function, made on behalf of themselves and all other creditors of the municipality, for the approval of a plan of adjustment or composition of the claims of all creditors or of a class or classes of them similarly situated, which plan shall be submitted with and made a part of the petition, the supreme court by a justice thereof may take jurisdiction of the subject matter and order the filing of the petition in the office of the clerk of the supreme court.

"The municipality and the commission shall be made parties to such proceeding. All creditors of the municipality shall be made parties thereto by notice to be published and given in such manner as the supreme court by its justice may direct. Any creditor of the municipality may appear and assert his rights.

"52: 27–35. Allegations in petition. In the petition the creditors shall allege that the municipality is or will be unable to pay in full according to their terms the claims proposed to be adjusted or composed and perform its public functions and preserve the value of property subject to taxation, that the adjustment or composition proposed in the plan is substantially measured by the capacity of the municipality to pay, is in the interests of all the creditors affected thereby, and is not detrimental to other creditors of the municipality.

"52: 27–36. Approval by supreme court justice of plan of adjustment or composition; findings. In any such proceeding, after hearing on the plan proposed or on the plan as modified by order and if such plan as proposed or modified is approved in writing by creditors representing eighty-five per cent in amount of the indebtedness affected thereby and by the municipality and the commission, the supreme court by a justice thereof may by order authorize and approve such adjustment or composition if the court by its justice determines (1) that the munic-

the proceedings; the plan, as amended, was approved by the court on July 21, 1937; on September 28, 1937, it was duly approved by the Municipal Finance Commission; on April 29, 1938, it was consented to by creditors representing "85 per cent in amount of the indebtedness affected" by the plan; and, on June 15, 1938, it was put into opera-

---

ipality is unable to pay in full according to their terms the claims proposed to be adjusted or composed, and perform its public functions and preserve the value of property subject to taxation, (2) that the adjustment or composition is substantially measured by the capacity of the municipality to pay, (3) that it is in the interest of all the creditors affected thereby, and (4) that it is not detrimental to other creditors of the municipality.

"52: 27–37. Approved plan binding on all creditors; substituted obligations. The plan of adjustment so authorized and approved shall forthwith and without any further action of any kind be binding upon all the creditors included in the plan, whether or not they appear in the proceeding. In so far as said plan provides for the substitution of any new bonds, notes or other obligations of the municipality in place of any outstanding bonds, notes or other obligations, or claims then outstanding, such substitution shall be effectual from and after such date as may be fixed in such order.

"52: 27–38. Continuance of stay of proceedings against municipality; action by creditor to enforce claim restricted. After the institution of any proceeding provided for by this article and pending the determination thereof, the supreme court by a justice thereof may by order continue the stay provided by sections 52: 27–32.1 and 52: 27–33 of this title.

"In the event that a plan shall be authorized and approved pursuant to this article the court shall retain jurisdiction of such proceeding and thereafter no creditor whose claim is included in such adjustment or composition shall be authorized to bring any action or proceeding of any kind or character for the enforcement of his claim except with the permission of the supreme court and then only to recover and enforce the rights given him by the adjustment or composition.

"52: 27–39. Reduction in principal of outstanding notes or bonds prohibited. Notwithstanding any provisions of this article the commission shall not approve any adjustment or composition, or plan presented pursuant to this article, which provides for the reduction in the principal amount of any outstanding notes or bonds of the municipality."

tion. The plan provided for the refunding of $10,750,000 of outstanding bonds; these were to be exchanged by the consenting creditors for new bonds to be issued in accordance with the terms of the plan approved by the court.

The appellants were holders of defaulted bonds and interest coupons issued by the City of Asbury Park in 1929 and 1930—prior, therefore, to the legislation which authorized the proceedings resulting in the challenged refunding scheme. The bonds of the appellants were part of the $10,750,000 of refunded bonds which, under the adjustment decreed by the court, could only be converted into new bonds maturing in 1966 and bearing a lower rate of interest than the original bonds. Deeming the arrangement authorized under the New Jersey statute to be violative of the Constitution of the United States, the appellants brought this suit for the face value of the old bonds and coupons. The Supreme Court of New Jersey dismissed the suit, 19 N. J. Misc. 322, 19 A. 2d 445; the Court of Errors and Appeals affirmed the dismissal, 127 N. J. L. 239, 21 A. 2d 796; and the case is here on appeal under § 237(a) of the Judicial Code, as amended, 28 U. S. C. § 344.

If the New Jersey legislation which is the foundation of the refunding plan for the City of Asbury Park is valid, appellants' claim on the old bonds was barred by law, and the judgment below must stand. The validity of that legislation is assailed on two grounds. It is contended, first, that the New Jersey laws constitute municipal bankruptcy legislation, that that field of law-making has been preëmpted by Congress, and that the New Jersey legislation is therefore inoperative. To this argument a few dates furnish a short answer. The present court proceedings began on February 1, 1936. The first federal Municipal Bankruptcy Act was declared unconstitutional on May 25, 1936. *Ashton* v. *Cameron County Dist.*, 298 U. S. 513. The refunding plan now assailed was approved, as we have seen, on July 21, 1937. It was thus authorized

more than a year before the enactment of the only relevant federal statute, the Act of August 16, 1937, 50 Stat. 653, amending the Bankruptcy Act to provide for the composition of indebtedness of taxing agencies. Assuming Congress had power to do so, this Act did not profess to terminate a pending state court proceeding like that now in question. It would offend the most settled habits in the relationship between the States and the Nation to imply such a retroactive nullification of state authority over its subordinate organs of government.

We prefer, however, to dispose of this objection on a broader ground. Not until April 25, 1938, was the power of Congress to afford relief similar to that given by New Jersey for its municipalities clearly established, *United States* v. *Bekins,* 304 U. S. 27, and then only because Congress had been "especially solicitous to afford no ground" for the "objection" that an exercise of federal bankruptcy over political subdivisions of the State "might materially restrict its control over its fiscal affairs" whereby States would no longer be "free to manage their own affairs." The statute was "carefully drawn so as not to impinge upon the sovereignty of the State. The State retains control of its fiscal affairs. The bankruptcy power is exercised . . . only in a case where the action of the taxing agency in carrying out a plan of composition approved by the bankruptcy court is authorized by state law." 304 U. S. at 50, 51. New Jersey expressly prohibits any municipality to avail itself of a federal bankruptcy act "unless the approval of the municipal finance commission . . . be first had and obtained." Revised Statutes of New Jersey (1937), 52: 27–40. The City of Asbury Park has never attempted to resort to a federal bankruptcy court, and the New Jersey Municipal Finance Commission has not authorized it to do so. Can it be that a power that was not recognized until 1938, and when so recognized, was carefully circumscribed to reserve full freedom

to the States, has now been completely absorbed by the Federal Government—that a State which, as in the case of New Jersey, has after long study devised elaborate machinery for the autonomous regulation of problems so peculiarly local as the fiscal management of its own household, is powerless in this field? We think not.

This brings us to the second and main contention, namely, that the appellants' claims in the form of the bonds and coupons issued by the City of Asbury Park, constituted contracts, the obligation of which is impaired by the denial of their right to recover thereon and by their transmutation, without their consent, into the securities authorized by the plan of adjustment.

The principal asset of a municipality is its taxing power and that, unlike an asset of a private corporation, can not be available for distribution. An unsecured municipal security is therefore merely a draft on the good faith of a municipality in exercising its taxing power. The notion that a city has unlimited taxing power is, of course, an illusion. A city cannot be taken over and operated for the benefit of its creditors, nor can its creditors take over the taxing power. Indeed, so far as the Federal Constitution is concerned, the taxing power of a municipality is not even within its own control—it is wholly subordinate to the unrestrained power of the State over political subdivisions of its own creation. "A municipal corporation . . . is a representative not only of the State, but is a portion of its governmental power . . . The State may withdraw these local powers of government at pleasure, and may, through its legislature or other appointed channels, govern the local territory as it governs the State at large. It may enlarge or contract its powers or destroy its existence." *United States* v. *Railroad Company,* 17 Wall. 322, 329. And see *Hunter* v. *Pittsburgh,* 207 U. S. 161.

In effect, therefore, the practical value of an unsecured claim against the city is inseparable from reliance upon

the effectiveness of the city's taxing power. The only remedy for the enforcement of such a claim is a mandamus to compel the levying of authorized taxes. The experience of the two modern periods of municipal defaults, after the depressions of '73 and '93, shows that the right to enforce claims against the city through mandamus is the empty right to litigate. See Hillhouse, *Lessons from Previous Eras of Default* (chap. IV in Chatters, Municipal Debt Defaults); Report of the Securities and Exchange Commission on the Study and Investigation of the Work, Activities, Personnel and Functions of Protective and Reorganization Committees (1936), Pt. IV: Committees for the Holders of Municipal and Quasi-Municipal Obligations, *passim;* Dimock, *Legal Problems of Financially Embarrassed Municipalities,* contained in Summary of Proceedings, American Bar Assn., 1st Annual Meeting (1935), Section of Municipal Law, p. 12 [see also XXII Virginia L. Rev. 39].

How, then, can claims against a financially embarrassed city be enforced? Experience shows that three conditions are essential if the municipality is to be kept going as a political community and, at the same time, the utmost for the benefit of the creditors is to be realized: impartial, outside control over the finances of the city; concerted action by all the creditors to avoid destructive action by individuals; and rateable distribution. In short, what is needed is a temporary scheme of public receivership over a subdivision of the State. A policy of every man for himself is destructive of the potential resources upon which rests the taxing power which in actual fact constitutes the security for unsecured obligations outstanding against a city.

To deny a State the means of giving substance to the taxing power which alone gives meaning to unsecured municipal obligations, is to hold, in effect, that the right to pursue a sterile litigation is an "obligation" protected by

the Constitution of the United States. For there is no remedy when resort is had to "devices and contrivances" to nullify the taxing power which can be carried out only through authorized officials. See *Rees* v. *City of Watertown,* 19 Wall. 107, 124. And so we have had the spectacle of taxing officials resigning from office in order to frustrate tax levies through mandamus, and officials running on a platform of willingness to go to jail rather than to enforce a tax levy (see Raymond, State and Municipal Bonds, 342–43), and evasion of service by tax collectors, thus making impotent a court's mandate. *Yost* v. *Dallas County,* 236 U. S. 50, 57. But if taxes can only be protected by the authority of the State and the State can withdraw that authority, the authority to levy a tax is imported into an obligation to pay an unsecured municipal claim, and there is also imported the power of the State to modify the means for exercising the taxing power effectively in order to discharge such obligation, in view of conditions not contemplated when the claims arose. Impairment of an obligation means refusal to pay an honest debt; it does not mean contriving ways and means for paying it. The necessity compelled by unexpected financial conditions to modify an original arrangement for discharging a city's debt is implied in every such obligation for the very reason that thereby the obligation is discharged, not impaired.

More than fifty years ago, Lord Bryce pointed out that the debt and taxation of American cities had reached "an alarming figure." Bryce, The American Commonwealth, p. 607. Beginning with 1915, the evil consequences of the unhealthy financial conditions of New Jersey municipalities began to occupy the attention of its legislature. Investigations by expert bodies led to a series of enactments tightening state control over municipal finances. See Reports of New Jersey Legislative Commission for the Survey of Municipal Financing, 1915, 1916, 1917; Reports

of New Jersey Commission on Municipal Taxation and Finance, particularly Report No. 2 (Municipal and County Debt, 1931). The Depression intensified the need for state control, and the establishment of the Municipal Finance Commission with the powers outlined above was designed, as stated by the legislature, to meet "the public emergency arising from a default in the payment of municipal obligations, and the resulting impairment of public credit." But this emergency, as the decisions in this Court during the last ten years amply testify, did not evaporate. Students of the subject have pointed out that, in the depression of 1893 as in that of 1873, "the worst financial difficulties for municipalities came in the fourth year of the depression." See Hillhouse, *supra,* at 14. History repeated itself, certainly as to New Jersey municipalities. See Report of New Jersey Municipal Finance Commission, 1937, and Second Annual Report of the Local Government Board (to which the functions of the Municipal Finance Commission were transferred in 1939), 1940, p. 11. The whole history of New Jersey legislation leaves no doubt that the State was bent on holding the municipalities to their obligations by utilizing the most widely approved means for making them effective. The intervention of the State in the fiscal affairs of its cities is plainly an exercise of its essential reserve power to protect the vital interests of its people by sustaining the public credit and maintaining local government. The payment of the creditors was the end to be obtained, but it could be maintained only by saving the resources of the municipality—the goose which lays its golden eggs, namely, the taxes which alone can meet the outstanding claims.

The real constitutional question is whether the Contract Clause of the Constitution bars the only proven way for assuring payment of unsecured municipal obligations. For, in the light of history, and more particularly on the

basis of the recommendations of its expert advisers, the New Jersey legislature was entitled to find that in order to keep its insolvent municipalities going, and at the same time fructify their languishing sources of revenue and thus avoid repudiation, fair and just arrangements by way of compositions, scrutinized and authorized by a court, might be necessary, and that to be efficacious such a composition must bind all, after 85 per cent of the creditors assent, in order to prevent unreasonable minority obstruction. As the court below pointed out, in view of the slump of the credit of the City of Asbury Park before the adoption of the plan now assailed, appellants' bonds had little value; the new bonds issued under the plan, however, are not in default and there is a very substantial market for them. The refunding scheme, as part of a comprehensive plan for salvaging Asbury Park, both governmentally and financially, was so successful that the refunding bonds were selling at around 69 at the time of refunding, while at about the time the present suit was brought commanded a market at better than 90. See Second Annual Report of the New Jersey Local Government Board, 1940, p. 39.

From time to time, ever since *Sturges* v. *Crowninshield*, 4 Wheat. 122, 199, it has been stated that a state insolvency act is limited by the Contract Clause of the Constitution in authorizing composition of preëxisting debts. So it is, but it all depends on what is affected by such a composition and what state power it brings into play. The dictum from *Sturges* v. *Crowninshield* is one of those inaccurate generalizations that have gained momentum from uncritical repetition.

If a State retains police power with respect to building and loan associations, *Veix* v. *Sixth Ward Assn.*, 310 U. S. 32, 38, because of their relation to the financial well-being of the State, and if it may authorize the reorganization of an insolvent bank upon the approval of a state superin-

tendent of banks and a court, but over the dissent of one-fourth of the depositors (except preferred or secured claimants), *Doty* v. *Love,* 295 U. S. 64, a State should certainly not be denied a like power for the maintenance of its political subdivisions and for the protection not only of their credit but of all the creditors by an adjustment assented to by at least 85 per cent of the creditors, approved by the commission of the State having oversight of its municipalities, and found wise and just after due hearing by a court.

The Constitution is "intended to preserve practical and substantial rights, not to maintain theories." *Davis* v. *Mills,* 194 U. S. 451, 457. Particularly in a case like this are we in the realm of actualities and not of abstractions and paper rights, of what things are worth in dollars and cents, and in what is proposed to realize paper values. "The question whether the remedy on this contract was impaired materially is affected not only by the precarious character of the plaintiff's right, but by considerations of fact—of what the remedy amounted to in practice." *Pittsburgh Steel Co.* v. *Baltimore Equitable Soc.,* 226 U. S. 455, 459. This was said of the claim of a creditor of a private corporation. How much more pertinent is it to claims of these appellants against the municipality of Asbury Park in the circumstances before us.[2] To say that the right of

---

[2] Compare *Chicago, B. & Q. R. Co.* v. *Nebraska,* 170 U. S. 57, 72. "Usually, where a contract, not contrary to public policy, has been entered into between parties competent to contract, it is not within the power of either party to withdraw from its terms without the consent of the other; and the obligation of such a contract is constitutionally protected from hostile legislation. Where, however, the respective parties are not private persons, dealing with matters and things in which the public has no concern, but are persons or corporations whose rights and powers were created for public purposes, by legislative acts, and where the subject-matter of the contract is one which affects the safety and welfare of the public, other principles apply. Contracts of the latter description are held to be within the supervis-

the Asbury Park bondholders in 1935 was of precarious character is pure understatement. And we have already seen how empty was the remedy with which to enforce that right.

"In the books there is much talk about distinctions between changes of the substance of the contract and changes of the remedy ... The dividing line is at times obscure." *Worthen Co.* v. *Kavanaugh,* 295 U. S. 56, 60. The dividing line will remain obscure if we deal with empty abstract rights instead of worldly gains and losses, if we indulge in doctrinaire talk about "rights" and "remedies," instead of giving these concepts a content that carries meaning to the understanding of men. Here we have no such action as that disclosed in *Worthen Co.* v. *Kavanaugh, supra,* where with "studied indifference to the interests of the mortgagee or to his appropriate protection," legislation was found "to have taken from the mortgage the quality of an acceptable investment for a rational investor," and the challenged changes of remedy were found to be "an oppressive and unnecessary destruction of nearly all the incidents that give attractiveness and value to collateral security." Here we have just the opposite—no security whatever except the effective taxing power of the municipality; the effective taxing power of the municipality prostrate without state intervention to revive the famished finances of the city; state intervention, carefully devised, worked out with scrupulous detail and with due regard to the interests of all the creditors, and scrutinized to that end by the state judiciary with the result that that which was

---

ing power and control of the legislature when exercised to protect the public safety, health and morals, and that clause of the Federal Constitution which protects contracts from legislative action cannot in every case be successfully invoked. The presumption is that when such contracts are entered into it is with the knowledge that parties cannot, by making agreements on subjects involving the rights of the public, withdraw such subjects from the police power of the legislature."

a most depreciated claim of little value has, by the very scheme complained of, been saved and transmuted into substantial value. To call a law so beneficent in its consequences on behalf of the creditor who, having had so much restored to him, now insists on standing on the paper rights that were merely paper before this resuscitating scheme, an impairment of the obligation of contract is indeed to make of the Constitution a code of lifeless forms instead of an enduring framework of government for a dynamic society.

We do not go beyond the case before us. Different considerations may come into play in different situations. Thus we are not here concerned with legislative changes touching secured claims. The New Jersey courts have held that under this very statute tax anticipations and revenue notes stand on an entirely different footing from other municipal obligations, and in relation to them no claim is affected by the Municipal Finance Commission Act of 1931. *State* v. *Fort Lee,* 14 N. J. Misc. 895, 188 A. 689; affirmed 118 N. J. L. 181, 191 A. 836. The differentiation thus made by New Jersey regarding various obligations in itself indicates the detailed care with which the legislation of the State proceeded in readjusting outstanding municipal obligations.

*Affirmed.*

MR. JUSTICE REED concurs in the result.