[L. A. No. 18935.   In Bank.   Mar. 19, 1946.]

S. SIWEL CO. (a Corporation), Appellant, v. COUNTY OF LOS ANGELES et al., Respondents.

Murphey & Davis and Alex W. Davis for Appellant.

J. H. O'Connor, County Counsel, A. Curtis Smith, Deputy County Counsel, and Clyde Woodworth, City Attorney (South Gate), for Respondents.

EDMONDS, J.—Under protest the S. Siwel Co. paid special assessments levied by the city of South Gate, and brought this action to obtain a refund.   Upon the appeal from the

judgment of dismissal entered after a general demurrer to the complaint was sustained and leave to amend denied, the questions presented for decision concern the validity of the assessments and the scope of certain sections of the Revenue and Taxation Code.

The facts alleged in the complaint and a proposed amended complaint may be summarized as follows: The appellant is the owner of land in the city of South Gate bordering on Wright Road, a highway of general county use. The highway was improved pursuant to a proceeding had under the Acquisition and Improvement Act of 1925, commonly known as the Mattoon Act (Stats. 1925, p. 849; Deering's Gen. Laws, Act 3276a; repealed by Stats. 1933, chap. 346, p. 949). In 1929, Acquisition and Improvement bonds to the amount of $43,400 were issued and sold. Special assessments were levied against lands in the district, of which the appellant's property constituted a large part. Levies for the years 1929-1933, inclusive, were paid by the Siwel Company, but assessments of the four subsequent years, 1934-1937, inclusive, were allowed to become delinquent. Only about 9 per cent of such assessments were paid by the property owners and the district was in economic distress.

Prior to June, 1938, bonds in the principal amount of $4,000 and interest had been paid in full, but of the outstanding bonds in the principal sum of $39,400, approximately $16,000 were delinquent in payment of principal and all were delinquent in payment of interest. The country was passing through a period of severe economic depression and the land values in the district shrank to a point where the total assessed valuation of all the taxable property within the district was at times less than the face value of the amounts outstanding on the bonded indebtedness. Taxes and assessments against a large percentage of the property in the district had been delinquent for five years and unless financial aid was made available, a considerable portion of the property would be stricken from the tax rolls.

Appropriate legislation had been enacted for the relief of districts in distress (Stats. 1935, p. 1250; Deering's Gen. Laws, Act 3303 l; Sts. & Hy. Code, §§ 1625.5-1628 as amended by Stats. 1935, pp. 2178, 2199, Stats. 1937, p. 160). In 1938, acting pursuant to these provisions and prior to the levy of any assessment for that year, the board of supervisors of Los Angeles County adopted a resolution which, after reciting

that Acquisition and Improvement District No. 11 of the city of South Gate was in economic distress because of excessive and burdensome special assessments and eligible for relief under sections 1626, 1627 and 1628 of the Streets and Highways Code, ordered that the county should purchase all of the outstanding bonds and deliver them to the city for cancellation. Pursuant to the resolution, all of the outstanding bonds were purchased and delivered to the treasurer of the city of South Gate. By order of the board of trustees of the city, on July 13, 1938, all of the bonds were canceled.

The appellant's demand thereafter made that the assessments for the years 1934-1937 be canceled was rejected by both the city and county. S. Siwel Co. then made payment under protest, and filed a timely claim for refund, followed by commencement of the present suit.

In challenging the ruling of the trial court that these facts do not state a cause of action entitling the Siwel Company to a refund of the amounts paid by it to discharge the assessments levied prior to the retirement of the bonds, the appellant takes the position that the assessments were collectible only for the purpose of meeting the obligation on the bonds, and the right to do so ceased to exist when the bonds were paid and canceled. Therefore, the argument continues, unless the amount paid to satisfy the assessments for the years 1934-1937 is refunded, the city will be unjustly enriched. And the appellant asserts that the procedure specified by the Revenue and Taxation Code may be used by a property owner to obtain a refund of assessments paid under the circumstances related in the complaint.

The city and the county contend that the cancellation of the bonds raised no bar to the collection of assessments theretofore levied. Under section 1626 of the Streets and Highways Code, it is said, the legislative body of the city was given discretionary power to direct the cancellation of any unpaid taxes and assessments, and in the exercise of that discretion decided not to cancel the assessments levied before 1938 against the property of the appellant and other property owners in the assessment district. If assessments levied prior to 1938 are canceled, the respondents assert, the landowners who defaulted in their obligations will obtain a benefit denied to those who paid the assessments placed against their properties.

The Acquisition and Improvement Act, supra, pursuant to

which the assessments now challenged by the appellant were levied, provided a method for the construction of street improvements and the acquisition of land therefor. The legislative body of any municipality was authorized by the statute to determine, after appropriate notice and hearing, the improvements which were to be made and the district which would be specially benefited by the improvements.

By the terms of the statute, the cost of an improvement was to be met by the issuance of bonds against the real property to be specially benefited by the improvements. Payment of the bonds was to be made out of a special fund to be constituted by the municipality for each district in which such bonds were issued. Each year, at the time of levying taxes for general municipal purposes, the city was required to levy against all lands within the district, "a special assessment tax in an amount clearly sufficient, together with any moneys which are or may be in said fund, to pay all the principal which has become or will become due and all interest which has become or will become payable on the bonds . . . before the proceeds of another . . . levy of taxes to be collected for general municipal purposes . . . can be made available for the payment of said principal and interest." These special assessment taxes, the statute read, should be "in addition to all other taxes levied for . . . municipal purposes" (§ 41).

The city of South Gate has delegated its functions relating to the collection of taxes to the county of Los Angeles. By the terms of the Acquisition and Improvement Act, levies for the payment of principal and interest requirements upon the bonds were to be "collected and enforced in the same manner and by the same persons and at the same time and with the same penalties and interest as are other taxes." Also, the statute specifically adopted the procedure provided by general law for the collection of taxes for general municipal purposes. (§ 41.)

Act 3303 *l* declares that city and county legislative bodies are "hereby fully and completely authorized and empowered, on the consent of the owners or holders of such bonds or indebtedness, to purchase, adjust, liquidate or cancel such bonds or indebtedness, or any part of them or it, and to carry out any plan or plans for the purchase, adjustment, liquidation, or cancellation of such bonds or indebtedness, or any part of them or it," and to "adjust, waive or cancel in whole or in part, any tax or taxes, assessment or assessments, penalty

or penalties and interest heretofore levied or taxed against any of the property or properties in such special assessment district which have been taxed or levied for the purpose of meeting the bonds or indebtedness of such special assessment districts.'' (§ 1.) Such legislative bodies are also authorized ''to appropriate and use any and all necessary funds, moneys, taxes, assessments and contributions, from whatsoever source derived, for the furtherance, consummation and conclusion of the purchase, adjustment, liquidation or cancellation of any bond or bonds . . . in whole or in part of such districts, and to pay from such funds, moneys, taxes, assessments and contributions all expenses necessary to carry on the furtherance, consummation and conclusion of such plan or plans.'' (§ 3.)

Section 1626 of the Streets and Highways Code provides that ''boards of supervisors in their respective counties may purchase or redeem at a discount, and may at any time in their discretion cancel or retire, bonds of any special assessment district, for the payment of which special assessments . . . have been or are to be levied, if the proceeds of such bonds are or have been used exclusively for the acquisition of rights of way or easements for, or for the construction, maintenance, improvement or repair of highways, bridges or culverts within such county or any city therein. The board may also pay any portion of the principal or interest of, or transfer such amount as the board deems proper to the interest and sinking fund for the discharge and payment of, any of such bonds.''

Section 1626.5 of the Streets and Highways Code reads, in part, as follows: ''In accordance with the provisions of sections 1627 and 1628, the boards of supervisors, in their respective counties, may appropriate money to refund, repay and adjust, by any method established by law, the principal, or any portion of the principal, of any special assessments or bonds issued to represent special assessments, which have become liens on lands and which have been levied under the direct or specific assessment method to pay for the acquisition of rights of way or easements for, or the construction, maintenance, improvement or repair of public highways, bridges, or culverts within such county or any city therein.''

In enacting legislation for the relief of the property owners in special assessment districts (Stats. 1935, chap. 354; Deering's Gen. Laws, Act 3303 *l*) the Legislature declared: ''During the fifteen years last past hundreds of districts have been organized throughout the State of California under the pro-

visions of the Road District Improvement Act of 1907 and the Acquisition and Improvement Act of 1925. Many of these districts were created during times of great economic prosperity and high land values. In many of such districts, due to the optimism of the times, or other causes, bonds for public improvements were issued in amounts in excess of the ability of the lands of such districts to bear the assessments necessary to pay the principal and interest on such bonds. Millions of dollars in assessed land valuation are located within districts created under these acts. Due to the present economic depression land values throughout the State have shrunk to the point where, in many cases, the total assessed valuation of all lands within a given district is less than the face value of the bonds outstanding in such district. Annual assessments upon individual parcels of land within these districts amount in many instances to more than the assessed value of such·land.

"Under present economic conditions property owners are unable to meet these high assessments and hundreds of such districts throughout the State have reached a point of hopeless delinquency.

"Inasmuch as the property owners of these districts cannot, under the law, pay their county or municipal taxes without at the same time paying the district assessments many cities and counties are unable to collect large sums of money badly needed for the purposes of government.

"Many hundreds of properties in these districts are being deeded to the State for delinquent taxes and assessments and unless the financial aid of the counties is immediately made available to assist these overburdened districts thousands of parcels of lands will be stricken from the tax rolls this year; thousands of property owners will lose their homes, millions of dollars in governmental revenue will be uncollectible and at the same time thousands of bondholders will be unable to realize any return upon their investments."

According to the allegations of the complaint, the economic situation of Acquisition and Improvement District No. 11 in the city of South Gate was exactly that which the relief statutes were enacted to remedy. Because of the inclusion of the levy for special assessments in the total amount of municipal taxes standing against a large portion of the property in the district and the sharp reduction in real estate values, the owners were unable to meet their tax obligations and delinquencies for five years were common.

Full relief was given by the board of supervisors which, by its resolution determined that this economic distress was occasioned by the excessive and burdensome special assessments. The county purchased *all* of the outstanding bonds and sent *all* of them to the city of South Gate for cancellation. Pursuant to the county's request, *all* of the bonds were canceled and, as the city and county each declare, these acts were done with the intention of the county to retain no claim for the repayment of any portion of the $29,550 which it expended for the bonds.

Yet, under these circumstances, it is vigorously contended, the property owners who could not meet their taxes because of the excessive and burdensome bond requirements were left by the action of the county with a lien against their property which could neither be enforced nor removed. Such a result runs counter to every principle of equity and fair dealing and does not give the full relief which·was given by the county.

■ Manifestly, the relief legislation was enacted to aid property owners whose taxes were delinquent; the fact of delinquency was stressed by the Legislature and recognized by the board of supervisors as the justification for extending· relief. Undoubtedly the county acted in part for the benefit of those property owners who had paid the assessments levied prior to the cancellation of the bonds, but the situation which the relief statutes were designed to remedy was the large number of tax delinquencies. For the county to purchase the bonds and cancel them but to leave the property owner with the same delinquent assessment which he had before would not meet the purpose of the legislation. If the assessments which the owner did not pay because of economic conditions could then be collected from him, the full relief intended by the statute, that is, to get the property back on the tax rolls, would not have been accomplished. For the land to be subject to the lien of delinquent assessments which could not be removed would also be contrary to the legislative purpose.

Under these circumstances, the amount paid by the Siwel Company under protest was either "erroneously or illegally collected" from it within the meaning of section 5096 of the Revenue and Taxation Code. The word "taxes" as used in that statute "includes assessments collected at the same time and in the same manner as county taxes." (§ 4801.) ■ Moreover, section 5096 is not limited to the recovery of taxes er-

roneously or illegally levied but authorizes the refund of taxes "erroneously or illegally collected." (*Evans* v. *County of San Joaquin*, 67 Cal.App.2d 452, 455 [154 P.2d 468].) The use of the word "collected" rather than the term "levied" or "assessed" is most significant. (Compare section 4986 authorizing a cancellation of taxes "levied or charged. . . . erroneously or illegally.")

This conclusion does not allow a property owner to withhold payment of an assessment and escape liability for the amount levied against his land if and when the collections from other owners in the district provide sufficient money to meet the principal and interest requirements upon unpaid bonds. For it is only when the board of supervisors, acting pursuant to the authority granted by the relief legislation and for the purpose of meeting economic distress within an assessment district, purchases and cancels *all* of the outstanding bonds and authorizes their cancellation that the delinquencies of the property owner are forgiven.

The judgment is reversed with directions to the trial court to overrule the general demurrer to the complaint and to proceed in accordance with the views here expressed.

Shenk, J., and Spence, J., concurred.

CARTER, J.—I concur in the judgment of reversal and am in accord with the views expressed in the opinion prepared by Justice Edmonds, but I believe there are other grounds for reversal than those advanced in said opinion.

Briefly put we have a situation in which an improvement was carried out by the city of South Gate in a certain portion or district of that city. To defray the costs of it bonds were issued by the city. Those bonds were not general obligations of the city but their payment was secured by the levy of a special assessment on the property in the district which was benefited by the improvement. Economic conditions impelled the Legislature to enact laws for the relief of the property in the district and for the broad purpose of restoring that property to the tax rolls in order that the general revenue should not suffer. (Sts. and Hy. Code, §§ 1626, 1626.5, 1627, 1628.)

The position taken by respondents is that the relief legislation may be interpreted to mean that the county may purchase all of the bonds, cancel them and turn them over to the

city. The latter may then cancel all or *no part* of the assessments which have been levied to retire the bonds. *In other words, the city could collect all of the assessments and devote that money to whatever municipal purpose it desired* in spite of the fact that the money enabling the city to so act *came from the county.* Such broad discretion in the city with respect to cancellation of assessments amounts in effect to a *gift by the county to the city,* for the county would have no control over the extent to which assessments were cancelled although it supplied the money for that purpose. The general taxpayers of the county would be compelled to pay for purely municipal activities of the city. To so interpret the act is to render it unconstitutional. Article IV, section 31, of the Constitution of California, provides: ''The Legislature shall have no power to give or to lend, or to authorize the giving or lending, of the credit of the State, or of any county, city and county, city, township or other political corporation or subdivision of the State now existing, or that may be hereafter established, in aid of or to any person, association, or corporation, *whether municipal or otherwise,* or to pledge the credit thereof, in any manner whatever, for the payment of the liabilities of any individual, association, municipal or other corporation whatever; nor shall it have power to make any gift or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever.'' [Emphasis added.] In applying the foregoing provision of the Constitution this court stated in *City of Oakland* v. *Garrison,* 194 Cal. 298, 303 [228 P. 433]:

''Section 31 of article IV of the constitution provides in effect that the legislature shall have no power to authorize the making of any gift of any public money to any *municipal corporation.* It may reasonably be concluded, and we shall assume for the purposes hereof, that this provision would prevent the appropriation of county funds to a municipal corporation even for a public purpose, if that purpose were purely municipal and of no interest or benefit to the county as a political subdivision.'' There are only two situations here involved in which the county may transfer its funds to a city without violating the Constitution. The first is where the purpose is to restore property to the county tax roll and thus lessen the burden of the general taxpayers of the county. The county thus benefits and the purpose of the transfer of

funds and use thereof is a public one and no gift has been made. This ordinarily arises where the county cancels assessments in special assessment districts. Such was the case in *County of San Diego* v. *Hammond*, 6 Cal.2d 709, 728 [59 P.2d 478, 105 A.L.R. 1155], where this court stated: "Respondents further complain that the improvements for which bonds were issued in some instances included water mains or sanitary sewers, or both, and that the county could not in the first instance have levied a tax for such purposes. It will be noted, however, that we have not based our conclusion that the county may contribute toward the payment of said original bonded indebtedness upon the ground that the county could in the first instance have paid a part of the cost of said improvement, but upon the ground that the *purpose of the payment of a portion of said indebtedness is to relieve the property in said delinquent districts of the heavy burden of taxes existing against it in order that the property may be restored to the tax rolls of the county and thereby and thereafter bear its proportionate share of the expense of maintaining said county.*" [Emphasis added.] However, in the case at bar, if the city may in its discretion *refuse to cancel any assessments* although the county has with its funds paid or cancelled the bonds, and may collect the assessments, *the property will not be returned to the county tax roll* for it has not been relieved of the assessments. The county and its general taxpayers have not benefited and hence no county public purpose has been served. The only way that the desired result may be accomplished is that the assessments are necessarily cancelled to the extent that the county has used its funds to purchase and cancel the bonds.

The second county public purpose, and hence not a gift, which might be achieved would be where the money spent is used for improvements in which the county has an interest as distinguished from those of purely local city concern. We have no such situation here. There is no restriction upon what use may be made of the assessments collected by the city after the bonds have been retired. The statute under which the bonds were issued provides: "Any money remaining in any acquisition and improvement district interest and sinking fund after all of the bonds of the district have been retired shall be transferred to the general fund of the . . . municipality, as the case may be, whose legislative body has had jurisdiction over the proceeding and may by said body

be used in repairing any public way in said district, regardless of whether a portion or all of the district as originally formed may have been included within one or more municipalities which did not include such portion or all of the district at the time the proceedings for the same were initiated." (Stats. 1925, p. 892, § 41.) It is very doubtful that that section has any application to the funds involved in the instant case, but even if it be assumed that it does, the money collected may be used for repairing public ways in the city in which the county has no conceivable interest. Hence there is a gift by the county to the city for a purely municipal purpose.

It is not to be supposed that the Legislature intended to authorize the county to give funds to the city and leave it to the arbitrary power of the latter to use them for other than county purposes, thus violating article IV, section 31, of the Constitution. And what is more, vest in the city the power to completely thwart the sole purpose of the relief statute, that is, to restore the property to the county tax rolls. It must necessarily follow that when the county, acting pursuant to the relief statute, buys the bonds and cancels them, the city must cancel the assessments in a corresponding amount.

The foregoing interpretation of the statute is fortified by the expressions therein that the bonds which may be purchased by the county are those connected with an improvement from which the county benefits. It provides: "It is the intention of this section that the expenditures authorized in section 1625.5 shall not be made, and that the funds specified in section 1627 *shall not be expended* for any of the purposes authorized in sections 1626 and 1626.5, *if the public highways, bridges or culverts* are of only local use." [Emphasis added.] (Sts. & Hy. Code, § 1628.) If the city may devote the money to purely local uses, the above safeguard is meaningless.

The relief legislation here involved contains the following provision: "Whenever as the result of the retirement, cancellation or redemption of bonds as in this section provided, the legislative body which conducted the proceedings for the issuance of such bonds by resolution duly passed determines that there is sufficient money in the interest and sinking fund or other proper fund to adequately provide for the retirement or payment of the penalties, interest and principal of all outstanding bonds of such district as the same are or shall

fall due, such legislative body may, in its discretion, direct the cancellation or, if its taxes are collected through another legislative body it *may in its discretion by resolution order such other legislative body to direct the cancellation of all or any portion of the unpaid taxes and assessments* and the penalties thereon and the lien thereof levied or to be levied for the payment of such penalties, principal and interest." [Emphasis added.] (Sts. & Hy. Code, § 1626.) In view of the foregoing discussion it seems clear to me that should the city exercise its discretion by refusing to cancel all of the assessments when all bonds have been purchased by the county and surrendered to the city for cancellation, and the city should thereafter collect such assessments, it would be required to reimburse the county for the amount so collected. Obviously, this was never contemplated by the framers of the relief legislation.

Schauer, J., concurred.

TRAYNOR, J., Dissenting.—Plaintiff brought this action to obtain a refund of special assessments paid under protest. Plaintiff's land was in a special assessment district within the city of South Gate, established under the Acquisition and Improvement Act (Stats. 1925, p. 849; Deering's Gen. Laws, 1931, Act 3276(a))* for the improvement of Wright Road, a highway of general county use. The defendant city undertook the proceedings necessary to form the district and issued bonds totalling $43,400 to cover the cost of the improvement. Annual assessments were levied to cover interest and installments of principal on the bonds. Plaintiff paid the assessments levied against its land each year until 1934. It let the assessments for the years 1934 to 1937 become delinquent. Ninety-one per cent of the lands in the district were delinquent for that period, and the district failed to pay interest and installments of principal on the bonds as they fell due. Bonds amounting to $39,400 face value were delinquent as to interest, and bonds amounting to approximately $16,000 face value were delinquent as to principal.

Throughout that period property values declined, and there

---

*This act was repealed in 1933 (Stats. 1933, p. 948) with a saving clause that the repeal did not affect any bonds theretofore issued or any assessments theretofore levied.

was an overwhelming number of delinquencies on special assessments throughout the state, often exceeding the actual value of the lands assessed. Emergency legislation became necessary to rescue the special assessment districts from insolvency and to enable the lands therein to bear their share of the general tax burden. County boards of supervisors were given wide powers to relieve special assessment districts and to liquidate in whole or in part the indebtedness of such districts by purchasing and cancelling their bonds. The legislative bodies that conducted the proceedings for the issuance of the bonds were given discretionary power to cancel delinquent assessments of such districts if they determined that the relief of the district required such cancellation. The pertinent provisions of this legislation are quoted in the margin.*

Pursuant to this legislation defendant county purchased the outstanding bonds and delivered them to defendant city for cancellation. The defendant city refused to exercise its power to cancel the delinquent assessments of the district. The county, which collected the city's taxes, therefore collected the delinquent assessments levied against plaintiff's land for the years 1934 to 1937. Plaintiff paid the delinquent

---

*Sections 1626, 1626.5, 1627, and 1628 of the Streets and Highway Code (as amended by Stats. 1935, pp. 2178, 2199, Stats. 1937, p. 160) provide:

"1626. In accordance with the provisions of sections 1627 and 1628, the boards of supervisors in their respective counties may purchase or redeem at a discount, and may at any time in their discretion cancel or retire bonds of any special assessment district, for the payment of which special assessments, levied wholly or partly in accordance with the assessed value of lands, or levied by direct assessment, have been or are to be levied, if the proceeds of such bonds are or have been used exclusively for the acquisition of rights of way or easements for, or for the construction, maintenance, improvement or repair of highways, bridges or culverts within such county or any city therein. The board may also pay any portion of the principal or interest of, or transfer such amount as the board deems proper to the interest and sinking fund for the discharge and payment of, any of such bonds. Such bonds may be redeemed or purchased at not to exceed eighty per cent of the face value of the unpaid principal and interest of such bonds. Whenever as the result of the retirement, cancellation or redemption of bonds as in this section provided, the legislative body which conducted the proceedings for the issuance of such bonds by resolution duly passed determines that there is sufficient money in the interest and sinking fund or other proper fund to adequately provide for the retirement or payment of the penalties, interest and principal of all outstanding bonds of such district as the same are or shall fall due, such legislative body may, in its discretion, direct the cancellation or, if its taxes are collected through another legislative body it may in its discretion by resolution order such other legislative body to direct the cancellation of all or any portion of the unpaid taxes and assessments and the penalties thereon and the lien

assessments under protest and filed a claim with the county for a refund on the ground that the assessments were illegally collected. The county denied the claim maintaining that it was under a duty to collect the uncancelled assessments. The trial court upheld general demurrers interposed by both defendants to plaintiff's complaint and entered a judgment of dismissal. Plaintiff appeals.

Plaintiff does not question the legality of the assessments as originally levied or the fact that the assessments on its property were delinquent while the bonds were still outstanding. Nor does it contend that the collections could be refunded had its assessments been paid before the bonds were cancelled. It does contend, however, that there is a fundamental principle of special assessment law that an assessment, even though validly levied and legally collectible when it became delinquent, becomes illegal after the bonds are retired, since its collection is no longer necessary to redeem the bonds. The alleged invalidity under this so-called principle arises, not from any defect in the assessments, but from

thereof levied or to be levied for the payment of such penalties, principal and interest. Such direction to cancel taxes shall be made to and the cancellation shall be made by the officer having control of the record thereof, with the written consent of the district attorney, county counsel, city attorney or other legal advisor of the legislative body directing the cancellation. Whenever only a portion of such taxes, assessments and liens are cancelled, it may be according to any uniform plan which in the discretion of such legislative body is deemed equitable. Where such property has been deeded to the State or other subdivision for such delinquent taxes or assessments a credit in similar amount shall be allowed upon the amount necessary to redeem. The officer who makes the cancellation of taxes, assessments and liens as hereinabove provided shall notify the State Controller or corresponding officer of such other subdivision of the credit which shall be allowed upon the right of redemption and such State Controller or such other officer shall thereupon allow such credit; provided, however, that in all respects except the collection and disbursement of redemption money the tax deed shall not be affected and shall remain unimpaired.

"1626.5. In accordance with the provisions of sections 1627 and 1628, the boards of supervisors, in their respective counties, may appropriate money to refund, repay and adjust, and may refund, repay and adjust, by any method established by law, the principal, or any portion of the principal, of any special assessments or bonds issued to represent special assessments, which have become liens on lands and which have been levied under the direct or specific assessment method to pay for the acquisition of rights of way or easements for, or the construction, maintenance, improvement or repair of public highways, bridges, or culverts within such county or any city therein. If the board of supervisors shall appropriate money to refund, repay or adjust assessments or bonds levied or issued by a city, it may delegate to the legislative

the fact that a property owner successfully delays payment of his share thereof until others have met the cost of the improvement represented by the bonds. There is no such principle of special assessment law. Nor could such a principle be adopted without repudiating the long established rule that special assessments are to be levied in accordance with benefits. To forgive the delinquent property owners solely because the nondelinquent owners or others have paid enough to meet the cost of the improvement would defeat the very object of making the levies in proportion to benefits and discriminate against those who pay their assessments. At the time of the levy, after the property owners are given notice and an opportunity to be heard, the share of each property owner in the burden is determined. It is impossible at that time to foresee what amount will actually be collected or in what order collections from each owner will be made. If the subsequent existence of funds in excess of the redemption price of the bonds invalidated the collection of delinquencies the shares of the individual property owners in the common burden would be fixed by the accidental course of the collec-

body of such city the disbursement of the funds appropriated therefor, on such terms and conditions as may be agreed upon by the board and the city.

"1627. The expenditures authorized in sections 1626 and 1626.5 may be made from: (a) The general fund of the county . . .

"1628. Before any expenditures are made under the authority of section 1626.5 or of sections 1626 or 1626.5 and 1627, the board of supervisors of the county shall, by a resolution adopted by a four-fifths vote of the members of the board, determine that the bonds or assessments, or the portions thereof, under consideration were issued or levied to acquire rights of way or easements for, or to construct, maintain, improve or repair public highways, bridges or culverts of general county use, and not of a purely local use. It is the intention of this section that the expenditures authorized in section 1626.5 shall not be made, and that the funds specified in section 1627 shall not be expended for any of the purposes authorized in sections 1626 and 1626.5, if the public highways, bridges or culverts are of only local use."

Act 3303*l*, Deering's General Laws, (Stats. 1935, p. 1250), provides: Section 1. "The legislative body of any city or county, or city and county, of the State of California, acting individually or in conjunction with any other such legislative body or bodies, wholly or partly within the boundary of which any special assessment district has been created, and the outstanding bonds or indebtedness of which district are payable by taxes or assessments levied wholly or partly in accordance with the assessed value of lands or property, shall be and it is hereby fully and completely authorized and empowered, on the consent of the owners or holders of such bonds or indebtedness, to purchase, adjust, liquidate or cancel such bonds or indebtedness, or any part of them or it, and to carry out any plan or plans for the purchase, adjustment, liquidation, or cancellation of such bonds or indebtedness, or any part

tions rather than by the fair distribution of that burden at the time of the levy.

In fixing the amount of an assessment, it is common practice for an assessing body to make the levy higher than it would have to if there were no delinquencies—a practice sanctioned by this court under the very act here in question. (*American Securities Co.* v. *Forward*, 220 Cal. 566, 572-577 [32 P.2d 343].) Only by anticipating delinquencies at the time of the levy can an assessment district expect to meet the payments on the bonds as they fall due. It does not, however, thereby forgive delinquent owners their share of the common burden. If collections of delinquent assessments became illegal as soon as the bonds were retired or enough money was on hand to retire them, delinquent property owners would reap a reward for their delinquency at the expense of those who paid their assessments. There would then inevitably be an overwhelming delinquency in the final years of any bond issue that would play havoc with the orderly collection of assessments. Many owners would soon learn that they could let their special assessments go delinquent without having to let their general taxes go delinquent (*Loew's Inc.* v. *Byram*, 11

---

of them or it, and if necessary or advisable to carry out such plan or plans under the bankruptcy laws of the United States of America, and any amendments thereto now or hereafter adopted, or under any law or laws of the State of California, enacted for the purpose of the purchase, adjustment, refunding, liquidation or cancellation of bonds or indebtedness of special assessment districts. In carrying out any such plan or plans the legislative bodies herein mentioned are fully authorized and empowered to adjust, waive or cancel in whole or in part, any tax or taxes, assessment or assessments, penalty or penalties and interest heretofore levied or taxed against any of the property or properties in such special assessment district which have been taxed or levied for the purpose of meeting the bonds or indebtedness of such special assessment districts.''

Section 2. ''Such legislative body or bodies shall be and hereby are also fully and completely authorized and empowered to enter into any plan, contract, agreement, escrow or trusteeship having for its purpose the purchase, adjustment, liquidation or cancellation of the outstanding bonds or indebtedness of such districts.''

Section 3. ''Such legislative body or bodies are hereby also fully and completely authorized and empowered in connection with the furtherance, consummation or conclusion of any such plan or plans, contracts, agreements, escrows or trusteeships to appropriate and use any and all necessary funds, moneys, taxes, assessments and contributions, from whatsoever source derived, for the furtherance, consummation and conclusion of the purchase, adjustment, liquidation or cancellation of any bond or bonds, indebtedness or indebtednesses, in whole or in part of such districts, and to pay from such funds, moneys, taxes, assessments and contributions all expenses necessary to carry on the furtherance, consummation and conclusion of such plan or plans.''

Cal.2d 746 [82 P.2d 1]) and would depend on the payments of more conscientious owners to relieve them of the necessity of paying their own assessments.

Likewise, delinquent assessments are not forgiven when the money to purchase and retire the bonds comes from the general funds of the county. The relief given the district by the county under the emergency legislation of 1935 did not automatically cancel the delinquent assessments. Such assessments could have been cancelled under that legislation had the legislative bodies concerned, who alone have that authority, considered such cancellation necessary. (Sts. & Hy. Code, §§ 1626, 1626.5; Deering's Gen. Laws, Act 3303 *l*, § 1; Stats. 1935, p. 1250.) That legislation expressly provides that cancellation of the assessments depends not only upon retirement of the bonds but on action of the appropriate legislative body. The authority to cancel assessments upon the retirement of the bonds is given by the same statutory provisions that vest in the legislative bodies the authority to purchase and retire the bonds, and it is a repudiation of those provisions for this court to hold that the assessments are automatically cancelled upon purchase and retirement of the bonds. There are many reasons why the statutes make such cancellation discretionary with such legislative bodies. Careful study must be made of any district before it can be determined which assessments should be cancelled and which not. Delinquencies may vary through the years preceding the last one, when there may be a total delinquency. If assessments for the last year only were cancelled, all property owners would be treated alike. It might be highly inequitable, however, to cancel the assessments of the earlier years when some paid and others did not. If the source of a district's difficulty were an exceptionally large levy for a single year, the property might be rehabilitated by cancelling, not all the assessments, but only the assessment for that year.

The legislative body of the defendant city in the present case decided that the assessments should not be cancelled, and its judgment has been vindicated by the fact that the property was so rehabilitated that the assessments could be and were paid. In the absence of cancellation of the assessments under the relief legislation of 1935, their collection is governed by section 41 of the Acquisition and Improvement Act, which provides that assessments shall be "collected and enforced in the same manner and by the same persons and at the same

time and with the same penalties and interest as are other taxes for state and county purposes . . . and all laws applicable to the levy, collection and enforcement of taxes for state and county purposes . . . (as the case may be) are hereby made applicable to said special assessment taxes.'' The assessments against plaintiff's property were validly levied and placed upon the tax rolls. Since they were never cancelled, but continued on the rolls as valid liens against the property, section 41 compels their collection unless enforcement of that section violates some constitutional provision.

The contention is advanced that collection of delinquent assessments after the county has purchased and cancelled the bonds would result in an impairment of contracts in violation of the federal as well as the state Constitution. This contention is based on the provision in section 41 imposing upon the municipality the duty to levy a special assessment tax in an amount clearly sufficient ''to pay the principal and interest of said bonds as the same shall become payable.'' The theory is that the language quoted forms part of the contracts of the property owner with the bond holders and the district and does not authorize an assessment except to obtain money to pay the principal and interest of the bonds. It will be noted that the foregoing provision refers to the ''levy'' of the assessment, and not to its collection. There is no contention that any of the levies in the present case were unnecessary for the purpose defined in the provision quoted; the alleged impairment of contracts cannot therefore result from any failure to observe that provision. Nor has there been any failure to comply with the ''collection'' provisions of section 41, which, as we have seen, compel the collection of assessments in the same manner as taxes for county purposes generally. The terms of any contract under the Acquisition and Improvement Act have thus been observed both as to the levy of the assessments and their collection. Moreover, the emergency legislation of 1935, pursuant to which the bonds were purchased and cancelled, did not enlarge the burden of plaintiff or other property owners but on the contrary materially reduced it. All the property in the district was relieved of the burden of assessments in subsequent years to meet accruing bond interest and principal. At the outset the property owners were entitled to relief from neither past nor future levies. Solely by virtue of a contribution by the county from its general funds have the owners been given relief from future levies. Such allevia-

tion, which increased the value of their properties, cannot rationally be interpreted as an impairment of contract rights of either the delinquent or other owners. The contract clause of the Constitution is "intended to preserve practical and substantial rights, not to maintain theories." (*Faitoute Iron & S. Co.* v. *Asbury Park,* 316 U.S. 502, 514 [62 S.Ct. 1129, 86 L.Ed. 1629].)

It is further contended that the county should have held the bonds instead of cancelling them to prevent the collection of the delinquent assessments from becoming invalid. The assessments continued on the tax rolls as valid liens against the property involved, however, and no statute or rule of law made their validity dependent on the county's holding the bonds until the assessments were paid. Bonds were essential in the relationship between the city, the bondholders, and the property owners. The redemption of the bonds eliminated all outside creditors and made it unnecessary for the county to retain the bonds, for the rights of defendants depended, not on the county's acquiring the rights of the bondholders, but on the relief legislation under which the bonds were purchased and cancelled and the delinquent assessments continued on the tax rolls. That legislation empowered the legislative bodies granting relief to such districts to determine the extent of the relief and the conditions under which it should be granted. In the present case they determined that the relief should not extend to the cancellation of the delinquent assessments but that such assessments should be collected. The statutory authority to retain the levied but unpaid assessments on the tax rolls after the claims of the bondholders are satisfied enables the agency, which, under authority of the same statute satisfied those claims, to obtain reimbursement for part of its advances. Reimbursement is in order here as in other instances where creditors of insolvent debtors accept payment by third parties in settlement of their claims and such parties are subrogated to the claims of the creditors. (See 4 Williston, Contracts, (Rev. ed.) 3628, 3664; 4 Pomeroy, Equity Jur. (5th ed.) 640; McClintock, Equity, 210; 50 Am. Jur., Subrogation, §§ 28, 70; 23 Cal.Jur. 920; *Meyers* v. *Bank of America,* 11 Cal.2d 92, 94 [77 P.2d 1084]; *Brantley* v. *Kelly,* 226 Ala. 47 [145 So. 649].) If the purchase and cancellation of bonds by a county, contemplated by the relief legislation, resulted in automatic extinguishment of all delinquent assessments in the district, the legislative bodies involved would have no discretion with

respect to the cancellation of such assessments as provided by the Legislature, nor could a county obtain reimbursement through collection of delinquent assessments for any funds advanced to relieve a district in distress. Such a rule would not only discourage advances and thus serve to defeat the purposes of the relief legislation, but would conflict with its express provisions that the legislative bodies may use assessments to effect the relief of the district (Deering's Gen. Laws, Act 3303 *l*, § 3) and may cancel them in their discretion. (Sts. & Hy. Code, § 1626; Deering's Gen. Laws, Act 3303 *l*, § 1.)

The county in the present case has elected not to reimburse its general fund out of the collection of delinquent assessments as it could have done under the provisions of the relief legislation. The provisions of the Acquisition and Improvement Act therefore control the disposition of the money collected. Under section 41 of that act, all collections on assessments are credited to the interest and sinking fund prescribed by that section, and "any money remaining in any acquisition and improvement district interest and sinking fund after all the bonds of the district have been retired shall be transferred to the general fund of the county, or municipality, as the case may be, whose legislative body has had jurisdiction over the proceeding and may by said body be used in repairing any public way in said district, regardless of whether a portion or all of the district as originally formed may have been included within one or more municipalities which did not include such portion or all of the district at the time the proceedings for the same were initiated." Thus if assessments were collected in sufficient amounts to retire the bonds, subsequent collections of delinquent assessments would be credited to the acquisition and improvement district interest and sinking fund and would be money remaining therein within the meaning of section 41. It is immaterial that the excess arises out of advances by the county rather than from the fact that the percentage of delinquencies was lower than anticipated when the assessments were levied. Pursuant to section 41, therefore, the money collected would be transferred to the general fund of the city of South Gate to be used by it in repairing any public way in the district.

It is contended that only money that was paid into the interest and sinking fund before the retirement of the bonds can be regarded as "remaining" therein upon such retire-

ment. The money collected, however, must be credited to the interest and sinking fund and *remains* therein if it is not used to pay interest and principal of the bonds, whether or not it was in the fund when the last bond was retired. The meaning of the provision is clear; any money credited to such interest and sinking fund shall be used primarily to pay interest and principal of the bonds, credits in excess of the total amount required shall be transferred to the city's general fund to be used for repairs of public ways in the district. Plaintiff contends that since there are only a few small public ways in the district, excepting state and county highways, the city does not need the money to repair such ways. The statutory provision, however, does not presuppose that at the time of the transfer of the money to the general fund of the city there is any actual need to repair public ways in the district, nor does it provide any time limit within which the money must be used for that purpose. The fact that the predictable expenses for such repairs are low, given the present system of public ways in the district, does not make the transfer invalid. The system of public ways in the district may be changed or the needs for repairs may increase. In any event, even if the cost of such repairs were low, the use of the money by the city would merely extend over a longer period than usual. Furthermore, a court cannot foresee in litigation concerning the collection of delinquent assessments whether the city will make proper use of the amount to be transferred to its general fund. It would be time enough to consider such question if the city's use of this money were challenged in an appropriate proceeding.

Any doubt as to the constitutionality of section 1626 of the Streets and Highways Code is resolved by the constitutional amendment adopted November 3, 1936, adding section 31 (c) to article IV: "No provision of the Constitution shall be construed as a limitation upon the power of the Legislature to provide by general law for the refunding, repayment or adjustment, from public funds raised or appropriated by the United States, the State, or any city, city and county, or county for street and highway improvement purposes, of assessments or bonds, or any portion thereof, which have become a lien upon real property, and which were levied or issued to pay the cost of street or highway improvements or of opening and widening proceedings which may be or may have become of more than local benefit. Any such acts of the

Legislature heretofore adopted are hereby confirmed and declared valid and shall have the same force and effect as if adopted after the effective date of this amendment." The county's expenditure in the present case to redeem bonds issued for the improving of a highway of general county use was made pursuant to legislation expressly confirmed and declared valid by this constitutional amendment.

Plaintiff's contentions find no support in the cases on which it relies. There is no question as to the validity of the assessments as originally levied or as to the fact that the assessments were a valid lien upon plaintiff's property when they became delinquent and when the bonds were still outstanding. The cases cited that concern assessments invalid when levied are therefore not in point. Thus, in *Connelly* v. *San Francisco,* 164 Cal. 101, 103 [127 P. 834], the levy was void because no bonds had been sold or contracted to be sold at the time it was made. In *Hellman* v. *Los Angeles,* 147 Cal. 653 [82 P.313], the levy was void because the ordinance providing for it described bonds that were not in existence. In *Smith* v. *Santa Monica,* 162 Cal. 221, 223 [121 P. 920], land condemned by the state for a park was held immune from sale under a tax lien on the ground that the lien was "merged and lost in the title which the state itself has taken." (See, also, 48 Am.Jur. 644.) In the present case no title has been established paramount to the lien of the assessments. Plaintiff relies particularly on two lines of cases that are clearly distinguishable. In the first, the improvement was abandoned before completion. (*Grimes* v. *County of Merced,* 96 Cal.App. 76 [273 P. 839]; *Bradford* v. *City of Chicago,* 25 Ill. 349; *Valentine* v. *City of St. Paul,* 34 Minn. 446 [26 N.W. 457]; *City of San Antonio* v. *Peters* (Tex. Civ. App.), 40 S.W. 827; *City of San Antonio* v. *Walker* (Tex. Civ. App.), 56 S.W. 952.) In the second, the actual cost of the improvement was less than the original estimate. (*Paving Dist. No. 5* v. *Fernandez,* 144 Ark. 550 [223 S.W. 24]; *City of Chicago* v. *Fisk,* 123 Ill.App. 404; *In re Schneider,* 136 App.Div. 444 [121 N.Y.S. 9]; *Wolfe* v. *Edgewood Borough,* 58 Pa.Super. 38.) Thus in all these cases the assessments exceeded the value of the improvements. In the present case, however, the plaintiff has received the full benefit of the improvements and has not been assessed beyond its cost. In fact, even with the payments in question, it has paid less than its pro rata share of the cost of the project. All the property owners in the district should be treated alike.

The allowance to plaintiff of a refund of the payments of its delinquent assessments creates an unfair discrimination against the other property owners who paid their assessments and who, as plaintiff concedes, are not entitled to a refund, and gives plaintiff a windfall as a reward for its delinquency.

Gibson, C. J., concurred.