22600

CITY OF NORTH CHARLESTON, a Municipal Corporation, et al., Appellant v. NORTH CHARLESTON DISTRICT, a Political Subdivision of the State of South Carolina, et al., Respondent.

(346 S. E. (2d) 712)

Supreme Court

---

*James E. Gonzales*, of *Gonzales & Gonzales*, North Charleston, *for appellant.*

*David G. Jennings*, North Charleston, *for respondent.*

Heard March 25, 1986.

Decided July 21, 1986.

FINNEY, Justice:

This is an action by the Appellant (City) to recover certain funds allegedly owed to it by the Respondent North Charleston District (NCD). The trial court generally ruled against the City's claims and awarded NCD judgment in the amount of thirty five thousand three hundred ninety seven and 24/100 ($35,397.24) dollars. We affirm.

## FACTS

The City of North Charleston (City) was granted its municipal charter on June 12, 1972, by which it was authorized

to provide a full range of municipal services. Prior to incorporation the municipal services were provided to this area by the North Charleston Consolidated Public Service District (NCCPSD). By Act No. 1768 of 1972, the General Assembly dealt with the 1972 incorporation by reconstituting the NCCPSD as the (1) North Charleston District (NCD) and (2) the North Charleston Sewer District (NCSD), excluding the City from jurisdiction of the NCD. NCD was authorized to provide fire protection, street lighting, sanitation and street cleaning services. NCSD was authorized to provide sewer service.

Act No. 1768 authorized NCD to contract with the City for services, and it provided a mechanism for equitable division with the City of assets held by NCD as a successor to the NCCPSD. The City and NCD entered into a contract on August 28, 1972, in which NCD agreed to provide its services to the City for the period commencing July 1, 1972, and ending June 30, 1973. On June 14, 1973, the parties entered into a second contract whereby the City agreed to provide certain services to NCD for the period commencing July 1, 1973, and ending June 30, 1974. The parties executed their final contract on July 9, 1974, providing that the City would provide certain services to NCD for the period commencing July 1, 1974, and ending June 30, 1975. The parties were unable to agree to a contract after termination of the latter contract, and each entity thereafter separately supplied the service needs of its respective constituencies.

By amended complaint dated November 22, 1982, the City sought to recover certain funds allegedly owed to the City by NCD under the terms of the 1973-74 and 1974-75 contracts and also sought, pursuant to Act No. 1768, a division of the assets held by NCD. The trial judge ruled against the City as to the relief requested and awarded judgment in favor of NCD.

## ISSUES PRESENTED
I. Whether Act No. 1768 of 1972 provides for a one-time division of assets or for a continuous division of assets between the District and City in each subsequent annexation by the City.

II. Whether stating the consideration for the 1974-75

services contract in terms of millage makes the contract *ultra vires* and that portion of the contract invalid.

III. Whether the reference to millage in the capital account portion of the 1974-75 contract should be invalidated and the dollar obligation of the City reduced pro rata.

IV. Whether the $78,599.43 South Carolina Electric And Gas franchise fee paid and delivered to the District on June 29, 1975, belongs to the City under the terms of the 1974-75 contract.

## I. ACT NO. 1768

The trial court found that under Act No. 1768, the City was entitled to only a one-time division of assets and the Act did not create a continuing obligation to divide assets as the City grows.

Section 22 of Act No. 1768 provides that "[t]he City is entitled to an equitable share of the assets belonging to the Special District, therefore, at such time as either the City or the Special District elects ... [and] upon such terms and conditions as shall be agreed upon ..."

Section 23 provides for the distribution of assets of the District in the event the City and the District cannot agree.

> SECTION 23. In the event the City Council and the Commission are unable to agree upon any allocation of the assets, moneys and properties of the Special District ... the assets, moneys and properties of the Special District shall be apportioned between the City and the Special District, in kind, or if the necessity exists, in value, according to the ratio, existing on the occasion that City Council fixes as the date when the City shall assume functions theretofore vested in the Special District, which their respective assessments bear to the assessment of the entire sewer district. ...

Section 23 mandates the ratio for division to be that which exists on the date when the City assumed functions theretofore vested in NCD. The City and NCD entered into a contract for services on June 14, 1973, which was to take effect July 1, 1973. Although the parties agreed on June 14, 1973, not to divide the assets, the court properly determined

that July 1, 1973, was the date when the City assumed functions therefore vested in NCD. Based on the valuation of assets on that date, the court determined the City was entitled to receive $28,555.00 from NCD.

The City argues that the scheme of Act No. 1768 is much broader than the trial court determined, as it anticipates future annexations by the City of portions of the District; therefore, there should be a continuing distribution of assets as the City grows through annexation. The City contends the ratio for the division of assets should be 58 percent for the City and 42 percent for NCD. This would result in the City being awarded an additional sum of $122,849.94 from NCD.

We find no basis in Act No. 1768 to support the City's position. The Act indicates a particular distribution formula to be followed in Section 23 and the valuation date is based on the date when the City assumed functions theretofore vested in NCD. It is uncontroverted that the effective date the city assumed functions of NCD was July 1, 1973.

## II. MILLAGE—1974-75 CONTRACT

The parties contracted for the year 1974-1975 upon the basis that "... the District shall cause to be levied for the calendar year 1974, a 40 mill *ad valorem* tax on the assessed value of all real and personal property located within the District ..." The Charleston County Auditor ultimately imposed only 39 mills. The City argues it should have been paid an additional $24,168.00 under the contract.

The trial court held that the contract was *ultra vires* because NCD did not have the authority to bind or circumscribe the discretion of the independent governmental body (i.e., the General Assembly) or officers (i.e., the Charleston County Auditor) in fixing the *ad valorem* millage rate to be assessed on behalf of NCD. We agree with the trial court.

It is a fundamental rule of contract construction that the law existing at the time and place of making of a contract is a part of the contract. *Ayres v. Crowley*, 205 S. C. 51, 30 S. E. (2d) 785 1944; 4 Williston, *Contracts*, § 615 at 597 (3rd ed. 1961). This rule applies in the area of governmental contracts. See *e.g. Colorado Investment Services v. City of Westminster*, 636 P. (2d) 1316 (1981); and 10 McQuillin, *Municipal Corporations*, 29.118 at 539 (3d ed. 1981).

A person who contracts with a municipality is charged with the knowledge of its limitations and restrictions in making contracts. See *Seaboard Airline Railway v. McFadden*, 156 S. C. 147, 152 S. E. 809 (1930); *Colorado Investment Services v. City of Westminster, supra;* 10 McQuillin, *Municipal Corporations*, § 29.04 at 207 (3d. ed. 1981). Neither a municipal corporation nor a special purpose district can, in any manner, bind itself by any contract which is beyond the scope of its powers. *G. Curtis Martin Investment Trust v. Clay*, 274 S. C. 608, 266 S. E. (2d) 82 (1980); 10 McQuillin, *Municipal Corporations*, § 29.04 at 208 (3d ed. 1981).

The City contends the trial court misinterprets the Contract. The parties did not contract to impose a 40 mill levy but only to pay a sum of money, and that the reference to millage in the contract was merely a measuring tool. We are not persuaded.

The contract clearly and unambiguously required NCD to levy a 40 mill *ad valorem* tax. NCD did not have ultimate authority to determine the *ad valorem* tax millage assessed and therefore, could not be bound by a figure over which it had no control. The General Assembly had authorized the County to Auditor to determine the appropriate millage to be assessed and the auditor's determination is binding.

The City concedes that it could not compel the General Assembly to authorize *ad valorem* taxes in an amount equal to 40 mills. But, the City argues that the General Assembly authorized NCD sufficient funds to carry out its functions, and therefore, NCD must discharge its contract obligations. NCD paid the City what was finally determined by the County Auditor as the appropriate millage to be assessed. NCD does not have the power or authority to levy beyond that rate. The City was aware of the budgetary process and NCD's lack of control over the ultimate amount of millage and it is not entitled to any additional sum.

### III. CAPITAL ACCOUNT FOR
### 1974-75 CONTRACT

This issue is not properly before this Court, because the City has not raised the issue in its pleadings nor was it raised before the trial court. See *Murphy v. Hagen*, 275 S. C. 334, 271 S. E. (2d) 311 (1980). Even if this

issue was properly before the Court, there is no evidence to support a pro-rata reduction in the capital account for the 1974-1975 contract year. The trial judge determined the value of the capital account based upon the actual tax collections rather than projected tax collections.

### IV. SCE & G FRANCHISE FEE

The City claims that it is entitled to receive $78,599.43 which was forwarded to NCD on June 29, 1975, by the South Carolina Electric & Gas Company (SCE & G). This amount represents the license fee due to NCD from SCE & G for calendar year 1976. NCD contends that the City has already received one franchise fee for each contract year and that NCD is under no continuing obligation to transfer funds to the City for calendar year 1976, during which there was no contract between the parties.

The record clearly reflects that the City actually received two SCE & G franchise fees from NCD. The franchise fee for calendar year 1974 was delivered to NCD on or about July 10, 1973, and was forwarded to the City on September 4, 1973. The franchise fee for calendar year 1975 was delivered to NCD on June 28, 1974, and was forwarded to the City on August 30, 1974.

The question for this Court to determine is whether the 1974 contract contains language which entitles the City to a third franchise fee for calendar year 1976. The City contends that these funds were received by NCD on June 29, 1975, and that Section 6.02 of the 1974 contract requires that they be paid to the City.

Section 6.02 requires NCD on *July 1, 1974*, to transfer all funds in its accounts to the City and to assign certain assets. With the exception of back taxes, there is no language in the 1974 contract which creates or imposes a continuing obligation on NCD to transfer any funds or assets received later in the contract year. The clear meaning of the phrase "on July 1, 1974" is to limit the duty of NCD to transfer and assign only those assets held by NCD on July 1, 1974. To construe the provisions of the contract in any other way would be to eradicate the essential term "on July 1, 1974," which is contrary to the general rule of contract construction. See *Bruce v. Blalock,* 241 S. C. 155, 127 S. E. (2d) 439 (1962).

The license fee was not received by NCD until two (2) days before the end of the 1974-75 contract period, and the parties did not have a contract for calendar year 1976 in which the franchise fee applied. In addition, Exhibit VII to the stipulation of exhibits shows the relevant franchise fee as deferred income and not as an asset at the time of receipt by the City. We agree with the trial court and conclude that there is no language in the contract to support the City's claim that it is entitled to receive the franchise fee for calendar year 1976.

We affirm the order of the trial court.

Affirmed.

NESS, C. J., and GREGORY, HARWELL and CHANDLER, JJ., concur.