23093

SOUTH CAROLINA PUBLIC SERVICE AUTHORITY, Respondent v. The CITIZENS AND SOUTHERN NATIONAL BANK OF SOUTH CAROLINA; NCNB South Carolina; The South Carolina National Bank; and Charles W. Waring, Jr., Julius Burgis, Burton A. Kaplan, and W. E. Barrett, Individually and on behalf of themselves and all others similarly situated, Appellants.

(386 S. E. (2d) 775)

Supreme Court

*Gary W. Morris,* Columbia, and *Theodore B. Guerard,* Charleston, both of *Haynsworth, Marion, McKay & Guerard, for appellants.*

*Robert W. Dibble, Jr.*, and *Jane W. Trinkley*, both of *McNair Law Firm*, Columbia, *for respondent.*

Heard Sept. 19, 1989.

Decided Oct. 23, 1989.

*Per Curiam:*

This case involves a declaratory judgment action brought by the South Carolina Public Service Authority (Authority), respondents, requesting that the trial court: (1) certify the case as a class action; (2) declare the rights of the parties to the case; and (3) enter a judgment declaring that a resolution changing the fiscal year does not violate any right of any bondholder or the Authority or violate any terms or covenants of any of the outstanding bond indentures or resolutions and that the Authority is entitled to implement such resolution. Judgment was entered for the Authority. Appellants, Citizens and Southern National Bank of South Carolina *et al.* (C&S), appeal from that portion of the trial judge's order which holds that the resolution will not violate any constitutional, statutory, or commonlaw right of any bondholder, will not impair any obligation of the authority to any person, nor otherwise adversely affect anyone holding any interest in any debt, security, or other obligation of the Authority.

We adopt the order of the circuit court as modified. The modified order of the circuit court is set forth below:

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This declaratory judgment action came before me for trial in Columbia on June 23, 1989. Following presentation of evidence and arguments by counsel, the court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

#### *Parties and Jurisdiction*

The plaintiff (hereinafter referred to as Santee Cooper or the Authority) is a body corporate and politic, organized pursuant to S. C. Code Ann. §§ 58-31-10 to 58-31-200 (1976 and Supp. 1988). Its principal place of

business is in Moncks Corner, South Carolina. The Citizens & Southern National Bank of South Carolina ("C&S") and The South Carolina National Bank ("SCN") are national banks organized and existing under the laws of the United States. Each has its principal place of business in Richland County, South Carolina. NCNB South Carolina ("NCNB") is a South Carolina corporation and has its principal place of business in Richland County, South Carolina. Each of the individual defendants is the owner of one or more bonds issued by Santee Cooper, is a citizen of South Carolina, and has not contested this suit being brought in Richland County.

Pursuant to this Court's orders dated April 12 and 13, 1989, and after presentation to the court of proof of publication of the Notice of Class Action in accordance with these orders, this case was certified as a class action. Each of the individual defendants has served as a representative of the class of all bondholders of Santee Cooper and, through his counsel, has represented the interest of all bondholders and of his respective subclass of bondholders.

Santee Cooper has outstanding approximately two billion dollars worth of bonds. Charles W. Waring, Jr., owns one bond issued pursuant to the 1949 Indenture and is the class representative for all holders of bonds issued under the 1949 Indenture. SCN is the trustee for all holders of bonds issued under the 1949 Indenture. Julius Burgis owns two bonds issued pursuant to the 1971 Expansion Bond Resolution ("1971 Resolution") and is the class representative for all holders of bonds issued under the 1971 Resolution. C&S is the trustee for all holders of bonds issued under the 1971 Resolution. Burton A. Kaplan owns two bonds issued pursuant to the 1985 Electric Revenue Bond Resolution ("1985 Resolution") and is the class representative for all holders of bonds issued under the 1985 Resolution. NCNB is the trustee for all holders of bonds issued under the 1985 Resolution. W. E. Barrett owns ten bonds issued pursuant to the 1988 Electric Revenue Bond Resolution ("1988 Resolution") and is the class representative for

all holders of bonds issued under the 1988 Resolution. SCN is the trustee for all holders of bonds issued under the 1988 Resolution.

Santee Cooper was created in 1934 and has operated on a fiscal year which begins on July 1 and ends on June 30 of the succeeding year. Most of Santee Cooper's competitors in the business of producing, generating, transmitting, distributing and selling electricity operate on a fiscal year based upon the Gregorian calendar.

During 1988, the General Assembly of South Carolina passed Act No. 658 of 1988 (Effective date June 8, 1988). Section 31 of Act No. 658 authorized Santee Cooper to adopt the calendar year as its fiscal year. On January 23, 1989, the Board of Directors of Santee Cooper adopted a resolution changing its present July 1 to June 30 fiscal year to a calendar year beginning January 1, 1990. Subsequently, Santee Cooper notified C&S, NCNB and SCN (as trustees of the bondholders) of the adoption of the resolution. Thereafter, C&S advised Santee Cooper that it believed the change in fiscal year would violate the rights of the bondholders for a number of reasons, all of which have been presented to the court, argued and briefed by counsel, and will be addressed herein. There exists between the parties actual controversy concerning the propriety of the change.

*Purpose of Change in Fiscal Year*
In recent years, members of the power industry have become increasingly competitive for territorial allocations and large industrial customers who can choose their provider of power. The competitive nature of the business affects publicly owned utilities whose accountability is to their customers and to the legislative bodies by whose grace they exist. Consequently, Santee Cooper has found itself having to justify to the General Assembly, as well as to its customers, its efficiency and the cost effectiveness of its operation. Furthermore, in areas where competition exists between providers, Santee Cooper must be able to demonstrate competitive rates to obtain and retain the business of customers who have a choice among providers of electricity. Ken Ford, President of Santee Cooper, testified that Santee Cooper's management and Board of Directors determined that chang-

ing Santee Cooper's fiscal year to a calendar year is necessary to enable Santee Cooper to compete effectively in the present market and to operate in a more efficient and prudent manner. Because all of the outstanding bonds are revenue bonds which will be repaid with revenues received by Santee Cooper, any actions that improve Santee Cooper's financial stability or competitive position also benefit the bondholders by enhancing their security.

Mr. Ford was a well-qualified and credible witness who was qualified as an expert to render opinions about the nature of the power industry, the effect that different fiscal years have on the planning, operations and business decisions of Santee Cooper and the need for Santee Cooper to change its fiscal year. Mr. Ford has worked in the public power industry for twenty-nine years. He is a certified public accountant with vast experience in the financial affairs of public utilities, including accounting, auditing, budgeting, rate-setting and planning. Based upon Mr. Ford's testimony, this court finds that Santee Cooper's purpose in changing its fiscal year is to improve its efficiency and that such improvements in efficiency as may occur as a result will inure to the benefit of the bondholders as well as to its customers.

A key part of Santee Cooper's internal evaluation of its operation is comparisons made with other utilities. Comparisons are made of operating costs, maintenance costs, debt to equity ratios and various other facets of the utility business. These comparisons are used to identify areas where Santee Cooper is out of line with comparable or similar utilities and to target areas where improvements in efficiency may be possible. They are also used to demonstrate Santee Cooper's relative efficiency and cost effectiveness. Lack of truly comparable data based on the same fiscal year as other utilities operating in the State and elsewhere reduces the credibility of the comparison data and hampers Santee Cooper's efforts to demonstrate its relative efficiency to potential customers, existing customers, the General Assembly, the financial community, bondholders and potential investors.

All of the investor owned utilities with which Santee

Cooper compares itself operate on a calendar year.[1] The majority of the publicly owned utilities with which Santee Cooper compares itself operate either on a calendar year or a federal fiscal year (one beginning October 1 and ending September 30). The utilities used for these comparisons are selected for their geographical proximity, comparable type of generating source and comparable mix of industrial and residential customers. Santee Cooper's most direct competitors are the largest providers in South Carolina, South Carolina Electric & Gas Company, Duke Power Co. and Carolina Power & Light, all of which are investor owned utilities operating on a calendar year.

Weather variations are the key variable in determining the revenue of a power company. Revenues are highest in the winter and summer months of peak usage. Because of differences from year to year in months in which the peaks fall, comparisons made between utilities who operate on different fiscal years are essentially comparing apples to oranges. Since Santee Cooper's fiscal year spans two calendar years, its standing in comparison with other utilities can vary significantly depending upon which years are chosen for the comparison. To make valid comparisons, a utility needs to compare its operations with utilities using the same fiscal year so that the effect of variations in weather conditions is neutralized.[2] The better information Santee Cooper has to work with the better projections it can make and the better it can plan for the future. For such comparisons to have credibility with rating agencies, customers, potential customers, regulators, and the investment community, the numbers used must be audited financial information.

Santee Cooper's present fiscal year also hampers its recruiting efforts. It competes with other utilities for May

---

[1] The Federal Energy Regulatory Commission, which regulates all investor owned utilities, requires those private utilities to operate on a calendar year. 18 C.F.R. Ch. 1, Part 101 at p. 316 (4-1-87 Edition). The Rural Electrification Administration, which regulates rural electrical cooperatives, requires those entities to use a calendar year, except in certain limited situations. REA Bulletin 181-1 at p. 101-2 (January 1, 1978).

[2] For this reason, some employees of Santee Cooper regularly convert the fiscal year data to calendar year data for use in their department. If Santee Cooper were on a calendar year, these employees could devote that time to other tasks.

engineering and other professional graduates but is unable to make offers until after June when its budget is approved. Consequently, a smaller pool of applicants is available and many of the best prospects have already accepted employment with other companies who are able to complete their hiring process earlier in the year because their budgets are approved earlier. Changing the fiscal year to a calendar year would enable Santee Cooper to compete more effectively for the top graduates because the budget would be approved prior to the prime hiring season.

### Bond Document Provisions Concerning The Fiscal Year

The 1971 Resolution defines "fiscal year" to mean July 1 to June 30. Section 1.1(1). By operation of law, the 1949 Indenture also incorporates a July 1 to June 30 fiscal year.[3] The 1985 Resolution, Section 1.1(j), and the 1988 Resolution, Section 1.1(i), define fiscal year to "mean the twelve month period beginning July 1 and ending June 30 or such other consecutive twelve month period determined by resolution of the Board of Directors of the Authority [Santee Cooper] to be its fiscal year."

The 1949 Indenture contains an audit provision that contemplates a June 30 fiscal year end. Section 9.11 provides:

> The Authority convenants that it will at all times keep proper books of record and account in which full, true and correct entries will be made of all its dealings and transactions in accordance with the Accounting Rules. So long as any of the Bonds shall be outstanding, the Authority will furnish to the Trustee in duplicate: .... (b) On or before each December 31, beginning with December 31, 1949, a full audit and report made and certified as correct by an Accountant (who may be the Accountant designated to prepare the audit for the Advisory Board of the South Carolina Public Service Authority pursuant to the Enabling Act) covering the operations of the Authority with respect to the System for the year ending on the preceding June 30, showing the gross Revenues, the expenses for maintenance and

---

[3] See Conclusions of Law, *infra.*

operation in respect to the System and the Net Revenues of the Authority for such year, and, in such detail as the Trustee may request, the assets, liabilities and financial condition of the Authority and an analysis of the surplus of the Authority with respect to the System, at the end of such year; and. . . .

The obligations of this section are not diminished by the change in the fiscal year.

The 1971 Expansion Bond Resolution contains a number of provisions concerning the fiscal year in addition to its July 1 to June 30 definition of fiscal year. Section 1.1(t) defines "Reserve Account Requirements" to mean:

as of any date of calculation, an amount for each series of Bonds then Outstanding equal to the maximum amount required to be paid into the Interest Account in the Expansion Bond Fund (hereinafter created) to provide for the payment of interest on the Bonds of such series and in the Fiscal Year from the date of issuance thereof to the date of final maturity thereof. . . .*

This definition is not affected by the change in fiscal year.

Section 2.6(c) of the 1971 Resolution contains what is called the Consulting Engineer's Statement of Net Revenues of the System in the Additional Bonds Test. The purpose of this section is to insure that Santee Cooper will collect sufficient revenues to enable it to meet the financial obligations of additional bonds. To calculate the anticipated net revenues for purposes of this test, the consulting engineer uses historical data from a "base period" that is any twelve consecutive month period within an eighteen month "window" immediately preceding issuance of the bonds. Adjustments are made to the historical data to reflect rate increases, new contracts, average hydroelectric generation over the past 20 years, etc., all of which adjustments are

---

* The circuit court misquoted Section 1.1(t) defining "Reserve Account Requirement." The last three line of Section 1.1(t) should read as follows:

. . . the Bonds of such series and in any Fiscal Year from the date of issuance to the final maturity date thereof.

This misquote in the circuit court's order does not affect any findings of fact or conclusions of law contained in the order.

aimed at normalizing the data on which the projections are based and/or incorporating known future factors. Ted Szymankiewicz of R. W. Beck & Associates, Santee Cooper's consulting engineer, testified by deposition that the change in fiscal year will have no effect on the issuance of new bonds because of the consulting engineer's use of historical data, the flexibility given the consulting engineer in choosing the base period, and the adjustments made to normalize the data on which the projections are made. The Additional Bonds Test will not be affected by the change in fiscal year because the projections for future revenues which are used to calculate the Additional Bonds Test are based upon historical data and will continue to be based upon historical data. That data will not differ if the fiscal year is changed to a calendar year because of the adjustments made to normalize the data on which the projections are made and the consulting engineer's flexibility in choosing which twelve months during the eighteen month window to use as a base period. *Cf., Continental Illinois National Bank & Trust Co. v. Washington,* 696 F. (2d) 692, 700 (9th Cir. 1983) *appeal dismissed,* 460 U. S. 1077, 103 S. Ct. 1762, 76 L. Ed. (2d) 338 (1983), *reh'g denied,* 461 U. S. 950, 103 S. Ct. 2130, 77 L. Ed. (2d) 1309 (1983) (addition of favorable referendum approval as prerequisite to issuance of bonds adds a new and unpredictable element to the test for issuance of additional bonds).

Section 2.7 of the 1971 Resolution is entitled "Authorization of Additional Bonds for Refunding Purposes." It provides that:

... the amount required to be paid or set aside in the Interest Account, Principal Account and Bond Retirement Account in the Expansion Bond Fund in any fiscal year in which any Bonds not to be refunded or purchased are to be Outstanding to pay the principal of and interest on such Additional Bonds shall not be greater than the amounts which would have been required to be paid or set aside in such fiscal year in the Interest Fund and Bond Fund established pursuant to the Indenture and in the Expansion Bond Fund established pursuant to this Resolution for credit to the Interest Account, Principal Account and Bond Retirement Account there-

in if the Original Bonds or Bonds to be refunded or purchased were not so refunded or purchased.

The change in fiscal year will have no effect on the meaning, operation or application of this section.

Section 5.1 of the 1971 Resolution continues the Revenue Bond established pursuant to the Indenture and provides:

> there shall be deposited in each month into the Capital Improvement Fund such amounts as the Authority shall determine, provided that in any event there shall be paid into said Fund in each fiscal year an amount at least equal to the amount required by Section 5.4 of this Resolution.

The change in fiscal year will have no effect on the meaning, operation or application of this section.

Section 5.2(D) provides for the Expansion Bond Fund as follows:

> Subject to the last paragraph of Section 5.5 hereof, if on the first day of any fiscal year the moneys and value of Government Obligations in the Expansion Bond Fund and credited to the Reserve Account therein are in excess of the Reserve Account Requirement, the amount of such excess shall be paid into the Revenue Fund. . . .

The change in fiscal year will have no effect on the meaning, operation or application of this section.

Section 5.4 provides for a Capital Improvement Fund:

> The Authority covenants and agrees with the holders of the bonds that it will deposit in the Capital Improvement Fund from the Revenues of the System in each fiscal year. . . .

The change in fiscal year will have no effect on the meaning, operation or application of this section.

Section 7.1 provides with respect to the 1949 Indenture:

> The Authority will not hereafter issue bonds, notes, certificates of indebtedness or other evidences of indebtedness or incur any other form of indebtedness under the Indenture payable *pari passu* from the Revenues of the Authority with the Original Bonds, except

that bonds may be issued under the Indenture for the purpose of paying the cost of refunding or purchasing the Original Bonds prior to maturity, including amounts to pay principal, redemption premium and interest to the redemption or purchase date and other costs of refunding or purchasing such Original Bonds, provided that the aggregate amount required to be paid or set aside in the Interest Fund and the Bond Fund held by the Trustee under the Indenture in any fiscal year to pay the principal of and interest on the refunding bonds shall not be greater than the amount which would have been required to be paid or set aside in such Funds to pay the principal of and interest on the Original Bonds refunded or purchased with the proceeds of said refunding bonds.

The change in the fiscal year will have no effect on the meaning, operation or application of this section.

Section 7.5 provides concerning insurance:

Within sixty days after the close of each fiscal year, the Authority shall file or cause to be filed, with the Bond Fund Trustee a Certificate of the Consulting Engineer describing in reasonable detail the insurance then in effect, whether obtained pursuant to the requirements of this Section 7.5, or the Indenture and stating that such insurance complies in all respects with the then applicable requirements. A copy of each such certificate shall be furnished to any holder of Bonds who shall file with the Authority a written request therefor.

The change in fiscal year will have no effect on the meaning, operation or application of this section.

Section 7.6 provides concerning Books of Account:

The Authority shall cause its books of account to be audited on or before each December 31 for the fiscal year of the Authority ending on the preceding June 30, by an independent certified public accountant or firm of independent certified public accountants, licensed, registered or entitled to practice, and practicing as such, under the laws of the State of South Carolina, who, or each of whom, is in fact independent and does not have

any interest, direct or indirect, in any contract with the Authority other than his contract of employment pursuant to this Section 7.6 and who is not connected with the Authority as an officer or employee of the Authority; provided, however, that such accountant or firm of accountants may be the accountant designated to prepare the audit for the Advisory Board of the South Carolina Public Service Authority required by the Enabling Act. A copy of each annual audit report showing in reasonable detail the financial condition of the System as of the close of each fiscal year, and the income and expenses for such year, including the transactions relating to any and all special funds and accounts created pursuant to the provisions of this Resolution, the amounts expended for maintenance and the amounts paid into the Capital Improvement Fund pursuant to Section 5.4 of this Resolution and expended or provided for renewals, replacements and gross capital additions to the properties of the System, shall be filed with the Bond Fund Trustee and the initial purchasers of each series of the Bonds and sent to any holder of Bonds filing with the Authority a written request for a copy thereof.

The obligations of this section are not diminished by the change in fiscal year.

Section 1.1(aa) provides that:

'Operating Revenues and Other Income' of the system for any fiscal year shall mean the sum of the 'Operating Revenues' 'Other Operating Income' and 'Other Income and Deductions' determined in accordance with the Uniform System of Accounts prescribed for Public Utilities and Licensees subject to the provisions of the Federal Power Act in effect on August 31, 1971 derived by the Authority from the ownership and operation of the System.

The change in fiscal year will have no effect on the meaning, operation, or application of this section.

Section 9.1(4) provides the following to be an event of default: "[t]he Authority [defaults under this section if it] default[s] in the observance and performance of any other of

the covenants, conditions and agreements on the part of the Authority contained in the Resolution and such default ... [has] continued for ninety (90) days;"

The 1985 and 1988 Resolutions contain cross-default provisions which render a default under earlier bond documents to be a default under those resolutions also. Article V of the 1985 Resolution provides that all terms of the 1971 Resolution will continue. Article XIII(b) of the 1985 Resolution contains a covenant that Santee Cooper shall comply with all terms and covenants of the 1949 Indenture and the 1971 Resolution. Pursuant to Article IX, Section 9.1(d), a default of the 1985 Resolution under the 1971 Resolution is also an event of default under the 1985 Resolution.

Article V of the 1988 Resolution provides that Santee Cooper will comply with all provisions of the 1971 Resolution. Article XIII(b) of the 1988 Resolution contains a covenant that Santee Cooper will comply with all terms and covenants of the 1949 Indenture, the 1971 Resolution and the 1985 Resolution. Article IX, Section 9.1(d) of the 1988 Resolution renders a default under the 1971 Resolution an event of default under the 1988 Resolution.

### Effect of Change to Calendar Year

As discussed above in connection with the purpose of the change and the specific bond document provisions, the effects of the change on the operations of Santee Cooper will be either neutral or positive. The change will provide Santee Cooper with better data for planning, comparisons with other utilities and evaluations of its own efficiencies. Employees who in the past have translated fiscal year data into calendar year data will no longer have to invest time in that exercise. Santee Cooper will be in a better position to compete in the market for customers, investors and new employees. Additionally, Santee Cooper's salary adjustments lag behind its competitors because they are able to obtain competitive salary information only for the preceding calendar year. Therefore, their salaries, which are fixed in June of the following year, are based on stale data.

The effect of the change on the marketability of the outstanding bonds has been and will be nil. Chandler McNair of Smith Barney in Columbia testified, and Bill Holmberg of

Kidder, Peabody in New York testified by deposition that the change in Santee Cooper's fiscal year has not affected and will not affect the marketability of its bonds, is not harmful to the bondholders in any way and to the extent the change enables Santee Cooper to manage itself better (through the provision of more comparable data) it is an indirect benefit to the bondholders. These opinions were based in part on a Moody's press release which stated that Moody's did not expect the change to have any affect on the credit ratings of Santee Cooper's bonds.[4]

## Necessity of this Action

No alternative to this action was available. The bond documents could not have been amended to reflect the change.

Section 13.06 of the 1949 Indenture allows amendment of the Indenture with the consent of the holders of 75% of the outstanding principal. As of June 22, 1989, 18,022 bonds were outstanding under the 1949 Indenture, in a principal amount of $56,530,000. Of these, 11,027 are bearer bonds (in a principal amount of $21,943,000) the identity of whose owners is unknown. To amend the 1949 Indenture pursuant to its terms, the consent of the holders of bonds in the amount of $42,397,500 would be required. The 6,995 registered holders own only $34,587,000 of the outstanding principal. Because less than 75% of the outstanding principal is registered, holders of $42,397,500 cannot even be identified. Furthermore, of the amount that is registered, approximately $33.8 million or about 98% is registered to Depository Trust Co. (DTC or Cede & Co.).

Consent of the holders of 66⅔% of the outstanding principal under the 1971 Resolution is required to amend the 1971 Resolution by consent. Section 10.6. The principal amount outstanding under the 1971 Resolution (bearer and registered) is $1,798,265,000. Of that amount approximately $1,293,965,000 or 71% is registered to DTC.

DTC serves as a nominal holder of bonds held by a number of institutions who hold the bonds for the beneficial owners. The trustees do not have the names of the beneficial

---

[4] The parties hereto stipulated to the presentation of expert testimony pursuant to Rule 703 of the Federal Rules of Evidence.

owners or even the institutional owners of the bonds that are registered to DTC. DTC does not have authority to consent to amendments to the 1949 Indenture or the 1971 Resolution.

Even if it were possible for the trustees to identify the holders of the bearer bonds under the 1949 Indenture, amendment by consent would not be a viable option. C&S once attempted to obtain consents from the holders of bonds issued by another entity, all of which bonds were registered. As with the Santee Cooper bonds,[5] many of those bonds were held by institutions which served as nominal holders. More than a third of those bonds were registered to DTC. C&S could not obtain consents from any of the institutional holders and failed even to receive a response from several of them. C&S was successful in obtaining responses from less than 4.5% of the holders of that issue and only 3.2% of the responses received were properly filled out; the other 1.19% were not countable.

## CONCLUSIONS OF LAW

This Court has jurisdiction to issue a declaratory ■■ judgment pursuant to S. C. Code Ann. § 15-53-30 (1976). Venue is proper in Richland County under S. C. Code Ann. § 15-7-30 (1976). Santee Cooper has authority to bring this action pursuant to S. C. Code Ann. § 58-31-30(2) (1976). This case is duly certified and appropriate for treatment as a class action and has been so treated in accordance with the Order dated April 12, 1989. Adequate and reasonable notice, sufficient to satisfy Rule 23, SCRCP and the due process clauses of state and federal constitutions, was given to the class members by publication, there being no way personally to notify many of the class members.[6]

---

[5] Of the $34,587,000 registered bonds under the 1949 Indenture, approximately $28 million or about 81% are registered to DTC. Of the $1.798 billion bonds outstanding under the 1971 Resolution, 71% are registered to DTC.

[6] The notice was published three times in three separate publications, in larger type than that normally used for legal notices. Publication in *The State* was reasonably calculated to reach bondholders residing or domiciled in the State of South Carolina. Publication in the *Bond Buyer* was reasonably calculated to reach institutional investors, brokers and financial advisors. Publication in the *Wall Street Journal* was as reasonably calculated to reach every class member as any means of notice Santee Cooper could have employed.

S. C. Code Ann. § 11-9-80 (1976), originally enacted in 1933, provides:

> In accordance with the terms of Section 10, Article 10 of the Constitution of South Carolina, as amended, the fiscal year of the State shall begin on the first day of July and end on the thirtieth day of June each year. All officers or servants of the State who are required to perform any duty at a specific time contingent upon the beginning and ending of the fiscal year shall perform such duties at such a time as will conform to the fiscal year beginning July first and ending June thirtieth. Nothing herein contained shall be held to affect the date for the assessment, levying or collection of any tax now provided for by law nor to affect the submitting of reports to the General Assembly. All officers or servants of the State shall keep their accounts and records in conformity with such fiscal year, opening them on the first day of July and closing them on the thirtieth day of June each year.

This section provides for a July 1 to June 30 fiscal year for the State of South Carolina and its departments.

The 1949 Indenture incorporates the law existing in 1949, including § 11-9-80, which was enacted in 1933. *City of North Charleston v. North Charleston Dist.*, 289 S. C. 438, 346 S. E. (2d) 712 (1986); *Ayres v. Crowley*, 205 S. C. 51, 30 S. E. (2d) 785 (1944). Since Santee Cooper is a quasi-municipal corporation that has been considered, for some purposes, to be an agency of the State, *Rice Hope Plantation v. South Carolina Public Service Authority*, 216 S. C. 500, 59 S. E. (2d) 132 (1950),** § 11-9-80 may apply to it, in the absence of any other statute specifically establishing a different fiscal year.

S. C. Code Ann. § 58-3-20 (1976) provides: "The advisory board shall on July first of each year, designate some reputable certified public accountant or accountants, resident in the State for the purpose of making a complete audit of the affairs of said Authority, which said audit shall be filed

---

** *Rice Hope Plantation* was expressly overruled on other grounds by *McCall v. Batson*, 285 S. C. 243, 249, 329 S. E. (2d) 741, 744 (1985). This, however, does not affect any findings of fact or conclusions of law contained in the circuit court's order.

with the annual report of the board of directors." This provision was not changed by Act No. 658, is not dependent on a July 1 to June 30 fiscal year and can be satisfied by Santee Cooper notwithstanding the change to a calendar year.

SPECIAL LEGISLATION

Defendants contend that Section 31 of Act No. 658 of 1988 constitutes special legislation which is violative of Article III, Section 34 of the South Carolina Constitution. Article III, Section 34 prohibits passage by the General Assembly of a special law when a general law can be made applicable. Assuming that Article III, Section 34 applies to Act No. 658, Section 31,[7] I conclude that a general law could not be made applicable and therefore Act No. 658, Section 31, does not constitute prohibited special legislation.

Santee Cooper has been held to be a quasi-municipal corporation that is for some purposes an agency of the State of South Carolina. *Rice Hope Plantation,* 216 S. C. 500, 59 S. E. (2d) 132 (1950). The General Assembly could not pass a general law allowing any agency of the State to change its fiscal year because the State and its departments and agencies are so intertwined in their operations that they must all operate on the same fiscal year. Santee Cooper, however, is unique. It receives no State funds and operates entirely on the revenues from its operation.

Furthermore, no other agency of the State is involved in the production, sale and distribution of electricity. The impetus for the change in Santee Cooper's fiscal year was the need to operate on a fiscal year comparable to that used by other utilities. This fact distinguishes this case from *Nichols v. South Carolina Research Authority,* 290 S. C. 415, 351 S. E. (2d) 155 (1986), on which defendants rely. No other agency has the need to or justification for changing its fiscal year that Santee Cooper has. Act No. 658, Section 31, was enacted to address a special condition facing Santee Cooper because

---

[7] An exception to the rule in Article III, Section 34 exists where the constitution gives the General Assembly authority to legislate directly in a matter. Article IX, Section 1 gives the General Assembly power to provide for the regulation, *inter alia,* of publicly owned utilities. Hence, Act No. 658, Section 31 falls within this exception to the prohibition in Article III, Section 34.

of its involvement in the power industry. As in *Duke Power Co. v. South Carolina Public Service Comm'n,* 284 S. C. 81, 326 S. E. (2d) 395 (1985), even if an act could have been framed in general terms, it would only apply to Santee Cooper. Accordingly, since a general law could not appropriately be made applicable to Santee Cooper's problem, Act No. 658, Section 31, is not prohibited special legislation.

## EQUAL PROTECTION

Defendants have alleged a violation of the Equal Protection Clause of the Fourteenth Amendment to the federal constitution and the Article I, Section 3 of the South Carolina Constitution. They object to Act No. 658's authorization for Santee Cooper to adopt a fiscal year different from any other state agency in South Carolina. The equal protection guarantees of the federal and state constitutions prevent only irrational and unjustified classification, not all classifications. *Regan v. Taxation with Representation of Washington,* 461 U. S. 540, 103 S. Ct. 1997, 76 L. Ed. (2d) 129 (1983). *GTE Sprint Communications Corp. v. Public Service Comm'n of South Carolina,* 288 S. C. 174, 341 S. E. (2d) 126 (1986). As discussed, *supra,* Santee Cooper is a unique state agency. The nature of the electric power business in which it is engaged and the comparisons Santee Cooper makes with other power companies makes it more advantageous for it to operate on a calendar year basis and justifies permitting it to do so while other, dissimilar state agencies continue operating on a July 1 to June 30 fiscal year. Therefore, defendants' equal protection claim is without merit.

## SINGLE SUBJECT MATTER

Article III, Section 17 of the South Carolina Constitution provides that "[e]very Act or Resolution having the force of law shall relate to but one subject, and that shall be expressed in the title." Defendants contend that Act No. 658 relates to more than one subject, and therefore deprives defendants of procedural due process guaranteed to them by the Fourteenth Amendment to the federal constitution and Article I, Section 3 of the South Carolina Constitution. This Court finds that defendants'

contention misconstrues the law. Section 31 relates to the single subject of Act No. 658: the finances of the state government.

Santee Cooper does not receive any State funds and does not pay any State taxes. *See* S. C. Code Ann. § 58-31-80 (Supp. 1988). However, it is required to make certain payments to the State in lieu of taxes, which payments become revenues of the State. S. C. Code Ann. § 58-31-90 (1976). *See also* S. C. Code Ann. § 58-31-110 (1976).

■ The constitutional law on this subject is well settled in South Carolina. The three objectives of the constitutional provision requiring that each act relate to one subject are to (1) apprise the members of the General Assembly of the contents of an act by reading the title, (2) prevent legislative log-rolling and (3) inform the people of the State of the matters with which the General Assembly concerns itself. *DeLoach v. Scheper,* 188 S. C. 21, 198 S. E. 409 (1938); *Arthur v. Johnston,* 185 S. C. 324, 194 S. E. 151 (1937); *Southern Power Co. v. Walker,* 89 S. C. 84, 71 S. E. 356 (1911).

In *DeLoach v. Scheper,* the Court recognized the breadth of this constitutional provision:

> [T]here is a marked distinction between the object of a law and the subject of a law. Very few enactments have but one object or purpose in mind. . . .

*DeLoach,* 188 S. C. at 28, 198 S. E. at 412.

\* \* \* \* \* \*

> [T]he constitutonal provision here invoked does not preclude the Legislature from dealing with several branches of one general subject in a single Act.

*DeLoach,* 188 S. C. at 29, 198 S. E. at 42. It would be impractical and time-consuming to require the legislature to pass a separate act on every separate branch of a subject.

In *State v. Byrnes,* 219 S. C. 485, 66 S. E. (2d) 33 (1951), the Supreme Court held that the subject of the 1951 Appropriations Act was state finances. It rejected a contention that the issuance of bonds was unrelated to this subject. *Byrnes,* 219 S. C. at 496, 66 S. E. (2d) at 36. Like the 1951 Appropriations Act, the subject of Act No. 658, the 1988 Appropria-

tions Act, is also state finances. The revenue received by the State from Santee Cooper is merely one branch of that subject.

The test for whether a provision relating to the subject matter of an appropriations bill is: "whether the challenged legislation was reasonably and inherently related to the raising and expenditure of tax monies." *Maner v. Maner,* 278 S. C. 377, 382, 296 S. E. (2d) 533, 536 (1982). If the same test is applied to the case at hand, the result is an obviously reasonable and inherent relationship between the authorization of a change in Santee Cooper's fiscal year and the revenue received by the State from Santee Cooper in the form of its payments in lieu of taxes.

Defendants also contend that Section 31 is a complete and separate act hidden within Act No. 658, and that its passage violated defendants' due process rights because of the lack of notice afforded by the title. The simple fact that Section 31 could stand alone as a separate act is not grounds for declaring it unconstitutional. *See, Hunt v. McNair,* 255 S. C. 71, 177 S. E. (2d) 362 (1970), *vacated,* 403 U. S. 945, 91 S. Ct. 2276, 29 L. Ed. (2d) 854 (1971), *on remand,* 258 S. C. 97, 187 S. E. (2d) 645 (1972), *aff'd,* 413 U. S. 734, 93 S. Ct. 2868, 37 L. Ed. (2d) 923 (1973). Just because Section 31 could have been enacted as separate legislation does not mean that it violates the Constitution by being combined with other legislation relating to the same subject. *State v. Byrnes; Hunt v. McNair.* also, because Section 31 of Act No. 658 relates to the raising of monies for the State, it is germane to and properly contained in the provisions of the appropriations bill.

Appellant argues that the title of Act No. 658 could not have apprised the legislature or the general public of the contents and effect of Section 31. This contention is without merit. The authorization for a change in Santee Cooper's fiscal year is undoubtedly and plainly set forth in the title. That any such change is not to affect payments due to the State is equally as plain. The contents of what is now Section 31 of Act No. 658 were added to the permanent provisions of the appropriations bill when it was

reported out of the Senate Finance Committee;[8] the title was amended at that time to reflect the addition of these provisions. The only people who would not have been properly informed of the contents of Act No. 658, Section 31 would have been those who did not read the title.

## IMPAIRMENT OF CONTRACTS

### A. *Preliminary Issues*

Article I, Section 10, cl. 1 of the United States Constitution provides in pertinent part that "[n]o state shall ... pass any ... law impairing the obligation of contracts...." Similarly, Article I, Section 4 of the South Carolina Constitution provides that "[n]o ... law impairing the obligation of contracts ... shall be passed...." It is well-settled that the Contract Clauses limit the power of states to modify their own contracts, as well as those between private parties. *E.g., United States Trust Company of New York v. State of New Jersey*, 431 U. S. 1, 17, 97 S. Ct. 1505, 1515, 52 L. Ed. (2d) 92, 106 (1977) *reh'g denied*, 431 U. S. 975, 97 S. Ct. 2942, 53 L. Ed. (2d) 1073 (1977). It is also well-settled under both state and federal law that the issuance of bonds gives rise to a contract between the state and the purchaser of its bonds. *E.g., Welch v. Getzen*, 85 S. C. 156, 163, 67 S. E. 294, 295 (1910). Thus, it is clear that the bonds issued by Santee Cooper constitute a contract between Santee Cooper and the purchasers of the bonds which is protected by the Contract Clauses of both constitutions.

*Act No. 658 does not unconstitutionally impair or breach any contract with the bondholders.*

Defendants contend that Act No. 658, Section 31 constitutes an unconstitutional impairment of the contract between Santee Cooper and its bondholders. This Court agrees that Act No. 658, Section 31, causes a technical impairment but not an unconstitutional one. Even though Act No. 658 does not require that Santee Cooper change its fiscal year, it does alter the obligations under the

---

[8] These provisions appear in the Senate Finance Committee Report as Section 46, Part II of House Bill 3880. It is now codified as S. C. Code Ann. § 58-31-220 (Supp. 1988).

1949 Indenture and 1971 Resolution by permitting Santee Cooper to change its fiscal year. The 1949 Indenture incorporated South Carolina law as it stood when the Indenture was consummated, including § 11-9-80. The 1971 Resolution specifically defines "fiscal year" to mean July 1 to June 30 and a number of its provisions are keyed to the fiscal year. However, for reasons discussed *infra*, the impairment resulting from Act No. 658 is *de minimus* compared to the potential benefit of the change to Santee Cooper and consequently, to its bondholders, and therefore does not constitute an unconstitutional impairment.

Act No. 658 does not, however, breach any contract with any bondholders. Because it is permissive, it does not interfere with the performance of any obligations under the Indenture or any resolution so no breach of contract has occurred by virtue of its passage. *See, Jackson Sawmill Co., Inc., v. United States,* 580 F. (2d) 302, 312 (8th Cir. 1978).

*The January 23d resolution does not constitutionally impair or breach any contract with the bondholders.*

Since Santee Cooper is recognized as an agency or instrumentality of the State, its January 23d resolution can be considered to have the status of a "law" within the meaning of both Contract Clauses. *See e.g., St. Paul Gas Light Company v. the City of St. Paul,* 181 U. S. 142, 148, 21 S. Ct. 575, 577, 45 L. Ed. 788, 791-792 (1901) ("It is no longer open to question that 'a by-law or ordinance of a municipal corporation may be such an exercise of legislative power delegated by the legislature to the corporation as a political subdivision of the State, having all the force of law within the limits of the municipality, that it may be properly considered as a law, within the meaning of the [Contract Clause].' "), *citing New Orleans Waterworks v. Louisiana Sugar Refining Company,* 125 U. S. 18, 31, 8 S. Ct. 741, 748, 31 L. Ed. 607, 612 (1888); *E & E Hauling, Inc. v. Forest Preserve District of Du Page County, Illinois,* 613 F. (2d) 675 (7th Cir. 1980) (ordinance passed by a county forest preserve district is a "law" within the meaning of the federal Contract Clause because the forest preserve district was a "state corporate and politic body" with authority delegated to it by state statute to pass and enforce all necessary ordinances, rules, and regulations for the management of the forest

preserve district property and for the conduct of the business of the district).

The early federal cases took a very literal view of the apparently absolute language of the Clause, stating that *any* deviation in the terms of a contract could constitute an impairment. *E.g.*, *Green v. Biddle*, 21 U. S. (8 Wheat) 1, 84, 5 L. Ed. 547, 568 (1823) ("The objection to a law, on the ground of its impairing the obligation of a contract, can never depend upon the extent of the change which the law effects in it. Any deviation from its terms, by postponing, or accelerating, the period of performance which it prescribes, imposing conditions not expressed in the contract, or dispensing with the performance of those which are, however, minute or apparently immaterial in their effect upon the contract of the parties, impairs its obligation."); *Planters' Bank v. Sharp*, 47 U. S. (6 How.) 301, 327 12 L. Ed. 447, 458 (1848) ("One of the tests that a contract has been impaired is, that its value by legislation has been diminished. It is not, by the Constitution, to be impaired at all. This is not a question of degree or manner or cause, but of encroaching in any respect on its obligation, dispensing with any part of its force.")

The federal courts, however, gradually drifted away from a literal interpretation of the Contract Clause. The current federal approach to the Contract Clause is typified by *United States Trust Co., supra*, in which the Supreme Court held that the repeal of a statutory covenant which had limited the ability of the Port Authority to subsidize rail passenger transportation from its revenues and reserves constituted an impairment of the states' contractual obligations with Port Authority bondholders.

In that case, the states of New York and New Jersey enacted in 1962 a statute which limited the ability of the Port Authority of New York and New Jersey to subsidize rail passenger transportation from revenues and reserves which had been pledged as security for bonds issued by the Port Authority. In 1974, New York and New Jersey, desiring the Port Authority to expand its role in providing public transportation, retroactively repealed the 1962 covenant. The United States Supreme Court held that this repeal impaired the states' contractual obligations because it

"eliminated an important security provision" intended to prevent the Port Authority from getting involved in deficit projects. *United States Trust Co.*, 431 U. S. at 19, 97 S. Ct. at 1516, 52 L. Ed. (2d) at 108.

In reaching its holding in the *United States Trust Co.* case, the Supreme Court set forth several guiding principles for Contract Clause analysis. While the Contract Clause appears to proscribe "any" impairment, that proscription is not absolute and is not to be read with literal exactness. *United States Trust Co.*, 431 U. S. at 21, 97 S. Ct. at 1517, 52 L. Ed. (2d) at 109. The finding of a technical impairment is simply the first step in determining whether there is an unconstitutional impairment of contract. The court next observed that the Contract Clause is not an absolute bar to subsequent modification of the State's own financial obligations. In this context, a law which impairs contractual obligations may be found constitutional if it is "reasonable and necessary to serve an important public purpose." *United States Trust Co.*, 431 U. S. at 25, 97 S. Ct. at 1519, 52 L. Ed. (2d) at 112. The Court cautioned, however, that in applying this standard where a state has impaired its own obligations, the usual level of deference accorded to a legislative determination of reasonableness should not be given. "[C]omplete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *United States Trust Co.*, 431 U. S. at 26, 97 S. Ct. at 1519, 52 L. Ed. (2d) at 112. The Court concluded that the states had not met their burden of showing that total repeal was reasonable and necessary and therefore the impairment was unconstitutional. In *Allied Structural Steel Company v. Spannaus*, 438 U. S. 234, 98 S. Ct. 2716, 57 L. Ed. (2d) 727 (1978), *reh'g denied*, 439 U. S. 886, 99 S. Ct. 233, 58 L. Ed. (2d) 201 (1978), the Court stated the balancing test to be applied in Contract Clause cases is as follows:

> the first inquiry must be whether the state law has, in fact, operated as a *substantial impairment* of a contractual relationship. The severity of the impairment measures the height of the hurdle the state legislation must clear. *Minimal alteration of contractual obligations may*

*end the inquiry at its first stage. Severe impairment,* on the other hand, *will push the inquiry to a careful examination of the nature and purposes of the state legislation.*

*Allied Structural Steel,* 438 U. S. at 244-245, 98 S. Ct. at 2722-2723, 57 L. Ed. (2d) at 736-737 (emphasis added) (footnotes omitted).

The January 23d resolution, like Act No. 658, Section 31, works a technical impairment because it changes a defined term in the 1971 Resolution and changes the fiscal year incorporated into the 1949 Indenture by operation of law. This is not, however, a substantial impairment or an impairment in a constitutional sense because there is no adverse effect on any bondholder as a result of the change. The constitution does not protect theories but rather practical and substantial rights. *Faitoute Iron & Steel Co. v. City of Asbury Park,* 316 U. S. 502, 514, 62 S. Ct. 1129, 1135, 86 L. Ed. 1629, 1637 (1942). Such minute impairment as results from the fiscal year change is more than offset by the potential benefits of the change to Santee Cooper and, consequently, to its bondholders. Furthermore, the change enhances Santee Cooper's ability to perform its covenant to operate in an efficient and business-like manner which is contained in Sections 7.3 and 7.10 of the 1971 Resolution. *Cf., Continental Illinois National Bank & Trust Co. v. Washington, supra.*

Moreover, no impairment occurs if a state alters its ██ ██ contract in favor of the other party. *United States v. State of Michigan,* 518 F. Supp. 966 (E. D. Mich. 1981). I believe that to be the case here. None of the provisions in the 1949 Indenture and 1971 Resolution that are affected by the change in definition of the fiscal year will be affected negatively. The change in Santee Cooper's fiscal year will have only neutral or positive effects on the bondholders. Hence, there is no impairment. *Allied Structural Steel.* Were there an impairment, however, it is reasonable and necessary to serve an important public purpose.

The South Carolina Supreme Court now applies the same standard for analyzing claims under the state constitution as the federal courts apply. *G-H Insurance Agency, Inc. v. Continental Insurance Co.,* 278 S. C. 241, 246, 294 S. E. (2d)

336, 339 (1982).[9] Since there is no unconstitutional impairment under the federal standard, the change in the fiscal year does not violate the state constitution either.

For the same reason that the change in fiscal year does not unconstitutionally impair any of the contracts with the bondholders, it does not breach any provisions of the contracts. Neither the 1949 Indenture nor any resolution contains any covenant or promise to maintain the July 1 to June 30 fiscal year. Rather, the 1971 Resolution simply defines "fiscal year" as July 1 to June 30, and § 11-9-80 arguably required Santee Cooper to operate on a July 1 to June 30 fiscal year. Nowhere has Santee Cooper covenanted that it will not change its fiscal year. The change is beneficial to Santee Cooper and hence to the bondholders also, for reasons previously discussed. In fact, the change is necessary to comply with Santee Cooper's covenant in Sections 7.3 and 7.10 of the 1971 Resolution to operate in an efficient and business-like manner. (*Dockside Association Inc. v. Detyens*, 291 S. C. 214, 217, 352 S. E. (2d) 714, 716 (Ct. App. 1987), *aff'd*, 294 S. C. 86, 87, 362 S. E. (2d) 874 (1987) (the court will not review the business judgment of a corporate governing board when it acts within its authority and it acts without corrupt motives and in good faith). Even if it were not required by that covenant, the change enhances Santee Cooper's ability to perform its obligation under that covenant. Defendants cannot complain of a breach of contract when Santee Cooper is performing all of its obligations under the 1949 Indenture and each resolution and when the change in fiscal year enhances its ability to continue doing so in the future.

### Substantive Due Process

Defendants contend that they have been denied due

---

[9] The most recent South Carolina cases involving the application of the state Contract Clause in the context of bond obligations are *Wolper v. City Council of the City of Charleston*, 287 S. C. 209, 336 S. E. (2d) 871 (1985), and *South Carolina Public Service Authority v. Summers*, 282 S. C. 148, 318 S. E. (2d) 113 (1984). Neither *Wolper* nor *Summers* discussed the applicable principles to be utilized in analyzing cases under the state Contract Clause. However, in *G-H Insurance Agency, Inc.*, the South Carolina Supreme Court stated that "[t]he mandate of the state and federal constitutions relating to impairment of contracts is basically the same...." 278 S. C. at 246, 294 S. E. (2d) at 339.

■ process in violation of the Fourteenth Amendment to the federal constitution and Article I, Section 3 of the South Carolina Constitution because their property rights have been taken from them without any provision for compensation. Since the effect of the change in fiscal year is in all respects neutral and/or beneficial to the bondholders and breaches no contract with the bondholders, no compensation is due to the bondholders and the fiscal year change effects no denial of due process.

### Alternative to Judicial Relief

The bond documents contain mechanisms for amend-
■ ment of their terms. However, because of the number of bearer bonds outstanding, the exact number of bondholders necessary to authorize an amendment cannot even be identified. Furthermore, as demonstrated by C&S' historically low success rate in obtaining responses from bondholders and the large number of bonds registered to DTC, I conclude that it would have been an impossible task to attempt to obtain the consent of a majority of the holders of the outstanding principal pursuant to the 1949 Indenture and the 1971 Indenture and therefore equity does not require that it be attempted. *Carmichael v. Dan Nance Corporation,* 274 S. C. 357, 361, 264 S. E. (2d) 601, 603 (1980) ("[e]quity will not require the doing of a futile task, nor foreclose the rights of a party ... for failure to do something which in view of all the facts would have been useless" (citation omitted).)

Accordingly, it is hereby ordered that the South Carolina Public Service Authority may change its fiscal year to a calendar year, that this change will not violate any constitutional, statutory or common-law right of any bondholder, will not impair any obligation of Santee Cooper to any person, nor otherwise adversely affect anyone holding any interest in any debt, security or other obligation of Santee Cooper.

And it is so ordered.

We have reviewed the order above and are in accord with the findings of fact and conclusions of law as modified.

Affirmed as modified.